716 A.2d 1137

HAMILTON AMUSEMENT CENTER, T/A VIDEO EXPRESS, L.O.J., INC., T/A THE EMPORIUM, PYNCO, INC., T/A CAMELOT BOOK STORE AND CRESCENDO BOOKS, INC., T/A CARNIVAL BOOKS, PLAINTIFFS-APPELLANTS, v. PETER VERNIERO, ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued January 22, 1998—Decided July 21, 1998.

256

258

260

*Barry Nelson Covert,* a member of the New York bar, argued the cause for appellants (*Steven S. Polinsky,* attorney; *Mr. Polinsky* and *Paul J. Cambria, Jr.,* a member of the New York bar, on the briefs).

*Larry R. Etzweiler,* Senior Deputy Attorney General, argued the cause for respondents (*Peter Verniero,* Attorney General of

New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal challenges the constitutionality of *N.J.S.A.* 2C:34–7c that restricts the size, number, and content of signs that sexually oriented businesses may display. The case calls for the sensitive balancing of the interests of sexually oriented businesses in free speech with the State's interest in minimizing the adverse secondary effects caused by those businesses. The Appellate Division found that the statute does not violate federal or state constitutional guarantees to freedom of speech and that the statute is not void for vagueness. 298 *N.J.Super.* 230, 689 *A.*2d 201 (1997). We granted certification, 150 *N.J.* 24, 695 *A.*2d 667 (1997), and now affirm.

I

For some time prior to August 1995, plaintiffs Hamilton Amusement Center, Inc., t/a Video Express, L.O.J., Inc., t/a The Emporium, Pynco, Inc., t/a Camelot Book Store, and Crescendo Book, Inc., t/a Carnival Books (collectively referred to as "Hamilton" or "plaintiffs") owned or operated sexually oriented businesses selling a variety of magazines, books and videotapes, including adult materials. Plaintiffs used large signs to advertise the types of products sold, operating hours, and the locations of entrances. On August 16, 1995, Governor Whitman signed Assembly Bill No. 252 (1994), *L.* 1995, *c.* 230, codified at *N.J.S.A.* 2C:34–6 and *N.J.S.A.* 2C:34–7, that directly affects those signs. *N.J.S.A.* 2C:34–6 defines the key words and phrases used in the legislation, and *N.J.S.A.* 2C:34–7 contains the restrictions on signage and the establishment of perimeter buffer requirements that triggered this litigation.

On September 3, 1995, plaintiffs instituted the present litigation challenging the constitutionality of the signage restrictions in

*N.J.S.A.* 2C:34–7c. Subsection c provides: "No sexually oriented business shall display more than two exterior signs, consisting of one identification sign and one sign giving notice that the premises are off limits to minors. The identification sign shall be no more than 40 square feet in size." *N.J.S.A.* 2C:34–7c.

Plaintiffs alleged in their complaint that those restrictions violate the First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution. Plaintiffs also contended that the provision is unconstitutionally vague because it fails to define "identification sign." Finally, they alleged that *N.J.S.A.* 2C:34–7c violates their Fourteenth Amendment rights to equal protection because the statute targets only sexually oriented businesses. Plaintiffs sought declaratory and injunctive relief to prevent the State from enforcing *N.J.S.A.* 2C:34–7c.

The trial court determined that *N.J.S.A.* 2C:34–7c was a content-based restriction on speech and applied strict scrutiny. The court found the provision unconstitutional under Article I, Paragraph 6 of the New Jersey Constitution because the State failed to articulate a factual basis to establish the legitimacy of its asserted compelling state interests—traffic safety and the protection of minors. Alternatively, the trial court found that the statute failed to survive the less onerous time, place, and manner analysis because it was not narrowly tailored to protect against the secondary effects of sexually oriented businesses. The trial court entered a permanent injunction on December 19, 1995.

The Appellate Division reversed, concluding that *N.J.S.A.* 2C:34–7c targets only commercial speech and therefore is not subject to strict scrutiny. *Hamilton, supra,* 298 *N.J.Super.* at 238, 689 *A.*2d 201. The Appellate Division reasoned that the protection of minors and the regulation of traffic safety are both substantial governmental interests, *id.* at 239–40, 689 *A.*2d 201, and that *N.J.S.A.* 2C:34–7c is not substantially broader than necessary because it allows two signs, does not proscribe other modes of advertisement, does not limit the material that may be displayed within the store, and does not place any significant

limitation on what may be advertised on the two signs. *Id.* at 241, 689 *A.*2d 201.

The Appellate Division construed the sign requirements to permit affixing the street numbers of the property as required by federal postal regulations and to permit the posting of temporary political signs. *Id.* at 241 n. 6, 689 *A.*2d 201. The Appellate Division also interpreted "identification sign" to include: the name of the establishment; its street number; its telephone number; its operating hours; and the general nature of the establishment. *Id.* at 242, 689 *A.*2d 201.

## II

First, we address plaintiffs' contention that *N.J.S.A.* 2C:34–7c violates state and federal constitutional guarantees of free speech. The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech...." *U.S. Const.* amend. I. The First Amendment restriction on governmental interference with free speech was made applicable to the states by the Fourteenth Amendment to the United States Constitution. *U.S. Const.* amend. XIV, § 1; *44 Liquormart, Inc. v. Rhode Island,* 517 *U.S.* 484, 516, 116 *S.Ct.* 1495, 1515, 134 *L. Ed.*2d 711, 736 (1996); *Cantwell v. Connecticut,* 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L. Ed.* 1213, 1218 (1940).

■ Article I, Paragraph 6 of the New Jersey Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." *N.J. Const.* art. I, ¶ 6. Because we ordinarily interpret our State Constitution's free speech clause to be no more restrictive than the federal free speech clause, *Shelton College v. State Bd. of Educ.,* 48 *N.J.* 501, 518, 226 *A.*2d 612 (1967), "[w]e rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution." *Karins v. City of Atlantic City,* 152 *N.J.* 532, 547, 706 *A.*2d 706 (1998); *see Bell v. Township of Stafford,* 110 *N.J.* 384, 393, 541 *A.*2d 692

(1988) (stating that constitutional approach taken by United States Supreme Court when examining commercial speech conforms to our own). Two exceptions to the general rule, which are not involved here, are political expressions at privately-owned-and-operated shopping malls, *New Jersey Coalition v. J.M.B.*, 138 *N.J.* 326, 650 *A.*2d 757 (1994), and defamation, *Sisler v. Gannett Co.*, 104 *N.J.* 256, 271, 516 *A.*2d 1083 (1986).

-A-

Our decision whether *N.J.S.A.* 2C:34–7c regulates only commercial speech will in turn determine the appropriate level of scrutiny to be applied. Plaintiffs argue that both commercial and political speech are impacted by the statute. They contend that even under the Appellate Division's construction of the statute to allow the posting of temporary political signs, they are prohibited from conveying political messages on the identification sign, from posting non-temporary political signs, and from posting signs related to religion or "everyday problems." Plaintiffs also contend that because the statute distinguishes between sexually oriented businesses and other businesses, strict scrutiny is appropriate. We find those arguments to be unpersuasive.

■ We begin our analysis by defining commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 *U.S.* 557, 561, 100 *S.Ct.* 2343, 2349, 65 *L. Ed.*2d 341, 348 (1980). It is " 'speech proposing a commercial transaction.' " *Id.* at 562, 100 *S.Ct.* at 2349, 65 *L. Ed.*2d at 348 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 *U.S.* 447, 455–56, 98 *S.Ct.* 1912, 56 *L. Ed.*2d 444 (1978)); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 *U.S.* 60, 66–67, 103 *S.Ct.* 2875, 2880–81, 77 *L. Ed.*2d 469, 477–78 (1983) (holding that combination of following characteristics of communication "provides strong support" for conclusion that communication is "properly characterized as commercial speech": advertisement, mention of specific product, and economic motivation).

■ *N.J.S.A.* 2C:34–7c restricts, rather than prohibits altogether, the signs that sexually oriented businesses may display. We find nothing to suggest that the statute restricts more than commercial speech, or that the Legislature contemplated that its application would extend beyond the commercial context. Although outdoor signs are often used to convey political, social, and commercial ideas, plaintiffs have made no showing of actual noncommercial use. *Metromedia, Inc. v. City of San Diego,* 453 *U.S.* 490, 501, 101 *S.Ct.* 2882, 2889, 69 *L. Ed.*2d 800, 811 (1981). On the contrary, the record reveals the messages conveyed on plaintiffs' signs that predated the litigation are limited to business identification, the types of products sold, business hours, location of the video rental sections of the businesses, location of entrances, and parking information. Although plaintiffs could conceivably use their signs to convey noncommercial messages, they have not done so. We therefore decline to discuss political speech in a hypothetical case that is not before us. Furthermore, nothing in the legislative history suggests that the Legislature intended that the statute restrict political speech. We hold, therefore, that the statute applies only to commercial speech.

-B-

■ Our conclusion that *N.J.S.A.* 2C:34–7c has as its purpose the regulation of commercial speech does not mean that no constitutional protection is afforded to plaintiffs. On the contrary, the First Amendment protects commercial speech when the threshold requirements are met: that the speech is not misleading and relates to lawful activity. *Central Hudson, supra,* 447 *U.S.* at 563–64, 100 *S.Ct.* at 2350, 65 *L. Ed.*2d at 349; *see Schad v. Borough of Mt. Ephraim,* 452 *U.S.* 61, 65–66, 101 *S.Ct.* 2176, 2180–81, 68 *L. Ed.*2d 671, 678–79 (1981) (recognizing First Amendment protection for sexually explicit speech that is not "obscene"); *In re Anis,* 126 *N.J.* 448, 456, 599 *A.*2d 1265 (1992). It is a limited measure of protection, however, because the First Amendment "accords less protection to commercial speech than to other consti-

tutionally-guaranteed expression." *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 72, 494 *A.*2d 804 (1985); *Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 125, 462 *A.*2d 573 (1983). The limited measure of protection afforded commercial speech is " 'commensurate with its subordinate position in the scale of First Amendment values.' " *Metromedia, supra*, 453 *U.S.* at 506, 101 *S.Ct.* at 2892, 69 *L. Ed.*2d at 814 (quoting *Ohralik, supra*, 436 *U.S.* at 456, 98 *S.Ct.* at 1912, 56 *L. Ed.*2d at 444); *Central Hudson, supra*, 447 *U.S.* at 562–63, 100 *S.Ct.* at 2349–50, 65 *L. Ed.*2d at 348–49.

*Central Hudson* articulated a four-part test for determining when regulating commercial speech does not violate the First Amendment:

 [I]t at least must concern lawful activity and not be misleading. [2] Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is no more extensive than is necessary to serve that interest.

[*Central Hudson, supra*, 447 *U.S.* at 566, 100 *S.Ct.* at 2350, 65 *L. Ed.*2d at 351.]

Subsequently, in *44 Liquormart*, the Supreme Court held that Rhode Island's complete ban on liquor price advertising violated the First Amendment. *44 Liquormart, supra*, 517 *U.S.* at 516, 116 *S.Ct.* at 1515, 134 *L. Ed.*2d at 736. Similarly, *Central Hudson* involved a total ban of forms of commercial advertising found to violate the First Amendment because the government failed to demonstrate that a more limited speech regulation would not have adequately served the governmental interest.

 Although the present case does not involve a total ban on commercial expression, the governmental regulation must be examined under both the *Central Hudson* standard and the time, place, and manner test articulated in *Clark v. Community for Creative Non–Violence*, 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L. Ed.*2d 221, 227 (1984). The time, place, and manner restrictions on protected speech are valid provided they "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication

of the information." *Ibid.* Because the *Central Hudson* and *Clark* standards are closely intertwined in this case, we will conduct the two analyses simultaneously. *City of Renton v. Playtime Theatres, Inc.*, 475 *U.S.* 41, 46, 54–55, 106 *S.Ct.* 925, 928, 932, 89 *L. Ed.*2d 29, 37, 42 (1986).

In addition to concluding that *N.J.S.A.* 2C:34–7c targets only commercial speech, we are also persuaded that the statute is content-neutral. A statute or ordinance is considered to be content-neutral when the legislature's predominant concern is with adverse secondary effects, such as those caused by sexually oriented businesses, and not with the content of the speech being restricted. *Ward v. Rock Against Racism*, 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2754, 105 *L. Ed.*2d 661, 675 (1989). An incidental effect on some speech does not change the content-neutral characterization. *Ibid.*

Having concluded that *N.J.S.A.* 2C:34–7c targets only commercial speech and that such speech is provided a limited measure of protection under the First Amendment, we are required to engage in an intermediate scrutiny of the restrictions imposed by *N.J.S.A.* 2C:34–7c. *Florida Bar v. Went For It, Inc.*, 515 *U.S.* 618, 623, 115 *S.Ct.* 2371, 2375–76, 132 *L. Ed.*2d 541, 549 (1995). Moreover, courts have generally analyzed statutes and ordinances restricting sexually oriented businesses under an intermediate level of scrutiny because of the unique secondary effects associated with those businesses. *Young v. American Mini Theatres, Inc.*, 427 *U.S.* 50, 70, 96 *S.Ct.* 2440, 2452, 49 *L. Ed.*2d 310, 326 (1976).

The intermediate scrutiny will be conducted pursuant to *Central Hudson* and *Clark*. "Unlike rational basis review [applied by the trial court in the present case], the *Central Hudson* [intermediate] standard does not permit [a court] to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 *U.S.* 761, 768, 113 *S.Ct.* 1792, 1798, 123 *L. Ed.*2d 543, 553 (1993). In this case, that means that the State cannot substitute another substantial interest for its assertion that *N.J.S.A.* 2C:34–7c is required to protect minors and to

promote traffic safety. It may, however, advance other substantial interests in addition to those two.

-C-

Under a commercial speech analysis, first we must determine whether the speech at issue merits protection by examining whether the speech concerns lawful activity that is not misleading. *Central Hudson, supra,* 447 *U.S.* at 566, 100 *S.Ct.* at 2350, 65 *L. Ed.*2d at 351. There has been no suggestion that the commercial advertising challenged here is misleading or involves unlawful activity or obscene material. Therefore, under the threshold prong of the *Central Hudson* test the case before us involves protected commercial speech.

Next, we focus on *Central Hudson*'s second prong, namely whether a substantial governmental interest is advanced by regulating the commercial speech involved here. We will combine that discussion with our analysis under the first prong of the time, place, and manner test: whether the regulation is justifiable without reference to content. In the trial court, the State argued that the statute served two substantial state interests: (1) traffic safety; and (2) the welfare of minors. Before the Appellate Division, the State expanded the list of secondary effects it sought to address with *N.J.S.A.* 2C:34–7c, arguing that sexually oriented businesses, as well as the signs that advertise their existence, generally detract from neighborhood stability and contribute to prostitution, crime, juvenile delinquency, deterioration in property values, and lethargy in neighborhood improvement efforts.

The burden is on the State to establish the existence of the substantial governmental interest it sought to advance through the signage regulation. To assist in meeting this burden, the State relies on an established rule of statutory interpretation:

Consistent with the judicial predisposition in favor of the validity of legislation, courts will readily impute a proper governmental purpose or interest as the object to be served by the enactment, and, if need be, infer an adequate factual basis to

support legislative regulations, even in the absence of particular purposes or specific findings being expressed by the lawmakers.

Nevertheless, if an enactment directly impinges on a constitutionally protected right, the presumption in favor of its validity disappears. Courts are far more demanding of clarity, specificity and restrictiveness with respect to legislative enactments that have a demonstrable impact on fundamental rights.

[*Bell, supra*, 110 *N.J.* at 394–95, 541 *A.*2d 692 (citations omitted).]

The government's failure to sufficiently substantiate its alleged substantial interests can be constitutionally fatal to a regulation. *See, e.g., id.* at 396, 541 *A.*2d 692 (striking down ordinance because of failure to reveal objectives or factual underpinnings); *Basiardanes v. City of Galveston*, 682 *F.*2d 1203, 1215–16 (5th Cir.1982) (finding that city had failed to prove justifiable interest in regulation prohibiting advertising by adult theaters because there was no evidence that city conducted careful study of effects of adult theaters). The First Amendment, however, does not require a legislative body "to conduct new studies or produce evidence independent of that already generated by other cities" before enacting a regulation affecting sexually oriented businesses, "so long as whatever evidence the [legislative body] relies upon is reasonably believed to be relevant to the problem" addressed. *City of Renton, supra*, 475 *U.S.* at 51–52, 106 *S.Ct.* at 931, 89 *L. Ed.*2d at 40. In *Renton*, the United States Supreme Court found that although the city had not conducted its own hearings on its locational zoning ordinance, it was entitled to rely upon another city's studies that had been placed in the record. *Ibid.* Unlike the city in *Renton*, however, when enacting *N.J.S.A.* 2C:34–7c, the Legislature did not place into the record the studies of this or any other jurisdiction; nor is there evidence that lawmakers relied on such studies. Similarly, the record does not reflect that the Legislature relied on decisional law from this or any other jurisdiction that discusses the detrimental secondary effects of sexually oriented businesses. Nonetheless, we will consider the precedents. Viewed collectively, a national consensus emerges regarding the secondary effects of sexually oriented businesses.

Both the United States Supreme Court and this Court have held that the government does not have a heavy burden to satisfy the

substantial governmental interest prong of the *Central Hudson* standard. That burden may be satisfied in a variety of different ways. As recently as 1995, the Supreme Court stated that

we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, see *City of Renton v. Playtime Theatres, Inc.*, 475 *U.S.* 41, 50–51, 106 *S.Ct.* 925, 89 *L. Ed.*2d 29 (1986); *Barnes v. Glen Theatre, Inc.* 501 *U.S.* 560, 584–585, 111 *S.Ct.* 2456, 115 *L. Ed.*2d 504 (1991) (Souter, J., concurring in the judgment), or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense," *Burson v. Freeman*, 504 *U.S.* 191, 211, 112 *S.Ct.* 1846, 119 *L. Ed.*2d 5 (1992). Nothing in *Edenfield, supra*, a case in which the State offered *no* evidence or anecdotes in support of its restriction, requires more.

[*Florida Bar, supra*, 515 *U.S.* at 628, 115 *S.Ct.* at 2378, 132 *L. Ed.*2d at 552.]

The Supreme Court has recognized that sexually oriented businesses can cause concrete and non-speculative side effects that government can target. These effects include promoting juvenile delinquency, contributing to an overall increase in crime, creating an environment that leads to the general deterioration of neighborhoods, and lowering property values. *City of Renton, supra*, 475 *U.S.* at 51, 106 *S.Ct.* at 931, 89 *L. Ed.*2d at 40.

 Additionally, this Court has held that a zoning ordinance need not articulate its objectives but may be sustained against constitutional challenge on the presentation in court of evidence supporting the governmental interest advanced by the ordinance. *Zilinsky v. Zoning Bd. of Adjustment*, 105 *N.J.* 363, 371, 521 *A.*2d 841 (1987). Thus, the substantial governmental interest prong can be satisfied by reference to studies pertaining to other jurisdictions, legislative history, consensus, and even common sense. The State maintains that the legislative history reflecting the State's substantial interest in ameliorating the negative effects of sexually oriented businesses consists of a position report submitted by Concerned Women for America, a floor speech given by the bill's sponsor, Assemblywoman Crecco, and the legislative history of *N.J.S.A.* 2C:33–12.2.

The Assembly Judiciary, Law and Public Safety Committee considered the Concerned Women report. That report focuses on

the connection between violent, sexually explicit material and violent crime, but does not mention signage. The report does not address traffic safety or harm to minors; nor does it address the additional effects that were presented to the Appellate Division.

Assemblywoman Crecco's speech supports the State's assertion that the Legislature was concerned with the protection of minors and the reduction of traffic hazards. She explained that "[s]ign restrictions would be advantageous because multiple signs distract motorists and cause accidents." Crecco also referred to the welfare of minors twice in her speech. First, she mentioned minors in reference to buffer planting, but not in reference to signage restrictions. Second, she stated that "[w]e need to put the brakes on these sorts of element [sic] in all municipalities.... Parents are concerned about their children being exposed to these types of perverted establishments and their sordid activities." Assemblywoman Crecco, however, did not offer evidentiary support for her conclusions.

Further support for the proposition that *N.J.S.A.* 2C:34–7c was enacted to protect the welfare of minors can be found in the text of the statute itself: *N.J.S.A.* 2C:34–7c requires a sign indicating that the premises are off-limits to minors. Moreover, because *N.J.S.A.* 2C:34–7c and *N.J.S.A.* 2C:33–12.2 [1] were part of the same package, consideration of the legislative history of the latter statute is appropriate. In *Chez Sez VIII, Inc. v. Poritz,* the Appellate Division held that *N.J.S.A.* 2C:33–12.2 was constitutional, relying on the pre-enactment evidence regarding private viewing booths. 297 *N.J.Super.* 331, 688 *A.*2d 119, *certif. denied,* 149 *N.J.* 409, 694 *A.*2d 194, and *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 337, 139 *L. Ed.*2d 262 (1997). The history of *N.J.S.A.* 2C:33–12.2 was not a part of the record in this case at the trial level, but the State introduced it before the Appellate Division. The State has requested this Court to take judicial notice of that history to

---

[1] *N.J.S.A.* 2C:33–12.2 expanded the criminal offense of maintaining a nuisance to cover sexually oriented businesses in certain circumstances.

establish that the Legislature had a factual basis for enacting *N.J.S.A.* 2C:34–7c.

The legislative history of *N.J.S.A.* 2C:33–12.2 indicates that, generally, the State was concerned with the negative effects caused by sexually oriented businesses, particularly businesses that operate private viewing booths. The history demonstrates that the Legislature was specifically informed about those effects when it simultaneously enacted *N.J.S.A.* 2C:33–12.2 and *N.J.S.A.* 2C:33–7c.

Furthermore, in an unpublished opinion, a federal district court upheld the 1995 amendments to *N.J.S.A.* 2C:34–2 to –7 against First and Fourteenth Amendment challenges. *Internationally Hott II v. City of Elizabeth,* Civ. No. 96–1447 (D.N.J. Apr. 9, 1997). The District Court found the statutes constitutional and determined that a memorandum submitted to the Senate Judiciary Committee, Deputy Attorney General Etzweiler's testimony before the Assembly Judiciary Committee, and Assemblywoman Crecco's statement "detail[ed] the need for these types of narrowly tailored statutes to combat the secondary effects of sexually oriented businesses." *Id.* at 13.

We conclude that the pre-enactment evidence that was before the Legislature when it enacted *N.J.S.A.* 2C:33–12.2 and *N.J.S.A.* 2C:34–7c, and the legislative history as a whole sufficiently establish that the Legislature was genuinely concerned with mitigating the adverse secondary effects of sexually oriented businesses to improve traffic safety, to limit harm to minors, and to reduce prostitution, crime, juvenile delinquency, deterioration in property values, and lethargy in neighborhood improvement efforts. Whether viewed separately or collectively, they represent substantial governmental interests. *See American Mini Theatres, supra,* 427 *U.S.* at 80, 96 *S.Ct.* at 2457, 49 *L. Ed.*2d at 332 (Powell, J., concurring) (finding interests in zoning adult movie theaters substantial because "[w]ithout stable neighborhoods, both residential and commercial, large sections of a modern city quickly can deteriorate into an urban jungle with tragic consequences to

social, environmental, and economic values"); *Metromedia, supra,* 453 *U.S.* at 507–08, 101 *S.Ct.* at 2892, 69 *L. Ed.*2d at 815 ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city— are substantial government goals."); *Borrago v. City of Louisville,* 456 *F.Supp.* 30, 33 (W.D.Ky.1978) (finding no doubt that regulation of adult entertainment furthers "important and substantial" interests); *City of Pasco v. Rhine,* 51 *Wash.App.* 354, 753 *P.*2d 993, 997 (1988) (finding that government had substantial interest in mitigating secondary impacts of adult theater's "location in an area not suitable for such theaters").

-D-

The third prong of the commercial speech inquiry is whether the regulation directly advances the government's asserted interests. *Central Hudson, supra,* 447 *U.S.* at 566, 100 *S.Ct.* at 2350, 65 *L. Ed.*2d at 351. This inquiry requires us to determine whether the elimination or reduction of the asserted negative effects of sexually oriented businesses can be achieved by regulating the number of signs, sign content, and sign size.

 "[A] governmental body ... must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield, supra,* 507 *U.S.* at 770–71, 113 *S.Ct.* at 1800, 123 *L. Ed.*2d at 555. Therefore, sign regulations are permissible if the government can "show that the particular restrictions on signs in fact relate to the stated goal." *State v. Miller,* 83 *N.J.* 402, 415, 416 *A.*2d 821 (1980).

 In *American Mini Theatres,* the United States Supreme Court found that a municipality's conclusion that the concentration of sexually oriented businesses, unlike other businesses, "causes the area to deteriorate and become a focus of crime" was "a factual basis" for the conclusion that dispersal requirements would "have the desired effect." *American Mini Theatres, supra,* 427 *U.S.* at 71 & n. 34, 96 *S.Ct.* at 2452–53 & n. 34, 49 *L. Ed.*2d at 326

& n. 34. Similarly, we hold that the limitation of the signs promulgated in *N.J.S.A.* 2C:34–7c directly advances the government's interests in limiting negative secondary effects, such as neighborhood deterioration and concentration of crime. The limitation of signage may reduce the effects generated by the presence of sexually oriented businesses, particularly in conjunction with the other provisions of *N.J.S.A.* 2C:34–7, dispersal requirements, locational restrictions, and perimeter buffers. *N.J.S.A.* 2C:34–7a to –7b.

In *Metromedia,* the Supreme Court found that the goal of increased traffic safety was furthered by the limitation of off-site advertising billboards. *Metromedia, supra,* 453 *U.S.* at 508–09, 101 *S.Ct.* at 2893, 69 *L. Ed.*2d at 815–16. The Court explained that " '[b]illboards are intended to, and undoubtedly do, divert a driver's attention from the roadway.' " *Ibid.* (quoting California Supreme Court decision in same case). The same is true of the on-site advertising signs limited by *N.J.S.A.* 2C:34–7c. *"Unlike oral speech, signs* take up space and may obstruct views, *distract motorists,* displace alternative uses for land, *and pose other problems that legitimately call for regulation." City of Ladue v. Gilleo,* 512 *U.S.* 43, 48, 114 *S.Ct.* 2038, 2041, 129 *L. Ed.*2d 36, 42–43 (1994) (emphasis added). The Legislature could reasonably conclude that the nature and content of the signs of sexually oriented businesses cause greater distraction to motorists than other commercial signs. *But cf. Rappa v. New Castle County,* 18 *F.*3d 1043, 1082 (3d Cir.1994) (Garth, J., concurring and dissenting) ("[T]he allowance of some signs, but not others, is evidence that the government's asserted interests in traffic safety and aesthetics are not sufficiently compelling to justify disparate treatment between classes of speech.").

We also conclude that the sign limitations serve the State's interest in protecting the welfare of minors. The Legislature has chosen to criminalize the sale, distribution, rental, or exhibition of obscene material to minors. *N.J.S.A.* 2C:34–3. The requirement that sexually oriented businesses post signs indicating that the businesses are off-limits to minors helps to ensure that minors will

be excluded from the premises. Furthermore, we find that the limitations on the identification sign reduce the ability of sexually oriented businesses to attract minors. Moreover, the other goals that we have determined are advanced by *N.J.S.A.* 2C:34–7c, such as limiting neighborhood deterioration and crime and promoting traffic safety, undoubtedly contribute to the welfare of minors who live in, or pass through, the vicinity of sexually oriented businesses.

-E-

The final prong of the commercial speech test is whether the regulation is no more extensive than necessary to serve the State's asserted interests. *Central Hudson, supra,* 447 *U.S.* at 566, 100 *S.Ct.* at 2350, 65 *L. Ed.*2d at 351. That inquiry is similar to that part of the time, place, and manner test requiring the narrow tailoring of the regulation and leaving open ample alternative means of communication. *Clark, supra,* 468 *U.S.* at 293, 104 *S.Ct.* at 3069, 82 *L. Ed.*2d at 227. Therefore, we must determine whether *N.J.S.A.* 2C:34–7c is narrowly tailored to serve the State's asserted interests. We combine the narrow tailoring discussion with our analysis under the final prong of the time, place, and manner test, whether the regulation leaves open ample alternative means of communication. *Clark, supra,* 468 *U.S.* at 293, 104 *S.Ct.* at 3069, 82 *L. Ed.*2d at 227.

■■■ *N.J.S.A.* 2C:34–7c is not substantially broader than necessary because it: (1) allows two signs to be posted; (2) does not proscribe other modes of advertisement; (3) does not inhibit the material that may be displayed within the store; and, (4) does not place any significant limitation on what might be advertised on the two signs. The statute does not ban advertising completely, and sexually oriented businesses have a reasonable opportunity to advertise in the print and electronic media. *SDJ, Inc. v. City of Houston,* 837 *F.*2d 1268, 1278 (5th Cir.1988), *cert. denied sub nom M.E.F. Enters., Inc. v. City of Houston,* 489 *U.S.* 1052, 109 *S.Ct.* 1310, 103 *L. Ed.*2d 579 (1989); *see also State v. J. & J. Painting,*

167 *N.J.Super.* 384, 386, 400 *A.2d* 1204 (App.Div.1979) (regulation "leaves unaffected all other means [for businesses] to advertise their business services—newspapers, telephone directories, radio and electronic media[, and word of mouth]"). The State "has gone no further than necessary in seeking to meet its ends. Indeed it has stopped short of fully accomplishing its ends: It has not prohibited all" signs. *Metromedia, supra,* 453 *U.S.* at 508, 101 *S.Ct.* at 2893, 69 *L. Ed.*2d at 815.

Furthermore, to satisfy *Central Hudson* and the narrow tailoring requirement of *Clark,* the regulation need not be the least restrictive means of serving the State's content-neutral substantial interest. *Ward, supra,* 491 *U.S.* at 797, 109 *S.Ct.* at 2757, 105 *L. Ed.*2d at 679. "[T]he requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation' " and the means chosen does not "burden substantially more speech than is necessary to further" the State's content-neutral interest. *Id.* at 799, 109 *S.Ct.* at 2758, 105 *L. Ed.*2d at 680–81 (quoting *United States v. Albertini,* 472 *U.S.* 675, 689, 105 *S.Ct.* 2897, 86 *L. Ed.*2d 536 (1985)).

Several other courts examining the same issue found regulations that are more restrictive than *N.J.S.A.* 2C:34–7c to be sufficiently tailored. For example, in *Excalibur Group, Inc. v. City of Minneapolis,* 116 *F.3d* 1216 (8th Cir.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 855, 139 *L. Ed.*2d 755 (1998), signs were prohibited in windows, a one-square-foot identification sign was permitted on the entrance door, and another identification sign equal to one-square foot for each foot of lot frontage on the street was allowed. All signs had to be flat, wall signs. That meant that a sexually oriented business with a twenty-five foot frontage could have one five-feet-by-five-feet sign. In the present case, a sign for the same frontage could be eight feet by five feet. The signage regulation was found not to be too restrictive because it limited only the outside of the businesses and the city could reasonably conclude that this limitation was best able to buffer the visual and

other impacts of those businesses on the neighborhood. *Id.* at 1222.

*SDJ* involved an ordinance requiring sexually oriented business to use "simple signs." *SDJ, supra,* 837 *F.*2d at 1278. Although the opinion does not contain a definition of "simple signs," the Fifth Circuit found that the signage requirements did not violate the First Amendment.

Similarly, in *Borrago, supra,* a district court upheld an ordinance that restricted adult entertainment establishments from having more than one outside sign, not to exceed ten feet in length and three feet in width, and "not to contain any emphasis, either by wording or picture or otherwise, on matters relating to sexual activities." 456 *F.Supp.* at 31. The court concluded that the restrictions were no greater than essential

> in light of the findings ... that the showing and advertising of adult entertainment attracts an undesirable quantity and quality of transients, causes an increase in crime, and encourages residents and businesses to move elsewhere. The findings, as to the undesirability of the transients who are attracted to this type of entertainment and as to the resulting increase in crime, justify the City in imposing strict controls over the persons who manage and control these types of businesses and also justify the restrictions on advertising.
>
> [*Id.* at 33.]

The signage regulation in *Borrago* limiting a sign to no more than thirty square feet was more restrictive than the forty square feet limitation at issue here.

We conclude that although there is no history to explain why the Legislature selected forty square feet as the size limitation, the choice of sign size falls within the ambit of *Renton*'s legislative discretion. " 'It is not [the] function [of the Court] to appraise the wisdom of [the governmental regulation because the government] ... must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.' " *Renton, supra,* 475 *U.S.* at 52, 106 *S.Ct.* at 931, 89 *L. Ed.*2d at 42 (quoting *American Mini Theatres, supra,* 427 *U.S.* at 71, 96 *S.Ct.* at 2440, 49 *L. Ed.*2d at 310). A sign that contains forty square feet represents a reasoned compromise between serving the State's asserted goals

and allowing some advertisement. Forty square feet is an adequate amount of space for a business to announce its presence given the secondary effects of sexually oriented business that are unrelated to the content of the signs.

 Furthermore, we conclude that the State has an interest in regulating the signage of sexually oriented businesses rather than leaving that function to municipalities. In addressing the goals of protecting minors and increasing traffic safety, a decision to regulate at a statewide level is rational because it creates uniformity, rather than relying on the various municipalities to regulate individually in their own ways.

## III

Next, we consider plaintiffs' vagueness argument. *N.J.S.A.* 2C:34–7c permits a sexually oriented business to display an "identification sign" that does not exceed forty square feet in size. The trial court held the sign statute void for vagueness because the word "identification" could mean more than name only. The Appellate Division interpreted the statute to mean that "an identification sign may communicate not only the name of the establishment, but also the street number, telephone number, operating hours and general nature of the establishment in order to identify the business." 298 *N.J.Super.* at 242, 689 *A.*2d 201. Based on that interpretation, the court found the statute was not vague. *Ibid.* Plaintiffs contend that the Appellate Division's interpretation of the statute has enhanced its vagueness. We disagree.

 A statute may be challenged as being either facially vague or vague "as applied." *State v. Maldonado,* 137 *N.J.* 536, 563, 645 *A.*2d 1165 (1994); *State v. Cameron,* 100 *N.J.* 586, 593, 498 *A.*2d 1217 (1985). Plaintiffs maintain that the statute is facially vague. The vagueness doctrine involves procedural due process considerations of fair notice and adequate warning. *Karins, supra,* 152 *N.J.* at 544, 706 *A.*2d 706. A law is void if it is so vague that persons " 'of common intelligence must necessarily

guess at its meaning and differ as to its application.'" *Town Tobacconist, supra,* 94 *N.J.* at 118, 462 *A.*2d 573 (quoting *Connally v. General Constr. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L. Ed.* 322, 328 (1926)).

"When a statute's constitutionality is doubtful, a court has the power to engage in 'judicial surgery,'" construing the statute in a constitutional way. *Town Tobacconist, supra,* 94 *N.J.* at 104, 462 *A.*2d 573. When a statute is vague, the court's "'power and obligation to narrow imprecise statutory language ... to render it constitutional is beyond question.'" *State v. Mortimer,* 135 *N.J.* 517, 533, 641 *A.*2d 257, *cert. denied,* 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L. Ed.*2d 351 (1994) (quoting *State v. Ramseur,* 106 *N.J.* 123, 200, 524 *A.*2d 188 (1987)). That power and obligation exist because the court "'begins with the assumption that the legislature intended to act in a constitutional manner.'" *Id.* at 534, 641 *A.*2d 257 (quoting *Right to Choose v. Byrne,* 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982)). Therefore, we must construe *N.J.S.A.* 2C:34–7c in a constitutional manner if it is reasonably susceptible to such a construction. *Ibid.* In the past, this Court has engaged in "'judicial surgery' to excise a constitutional defect or engraft a needed meaning." *Right to Choose, supra,* 91 *N.J.* at 311, 450 *A.*2d 925; *see Mortimer, supra,* 135 *N.J.* at 534–35, 641 *A.*2d 257 (excising unconstitutionally vague language from statute on bias crimes); *Town Tobacconist, supra,* 94 *N.J.* at 104, 462 *A.*2d 573 (excising unconstitutionally vague portion of "drug paraphernalia" definition in Drug Paraphernalia Act); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75–81, 411 *A.*2d 168 (1980) (limiting election financing reporting act to avoid overbreadth); *Borough of Collingswood v. Ringgold,* 66 *N.J.* 350, 357, 331 *A.*2d 262 (1975), *appeal dismissed,* 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L. Ed.*2d 826 (1976) (limiting ordinance requiring prior registration of canvassers and solicitors to door-to-door activity on private property); *Camarco v. City of Orange,* 61 *N.J.* 463, 466, 295 *A.*2d

353 (1972) (limiting anti-loitering ordinance to interference with others in public places or threats of immediate breach of peace).

In *State v. DeSantis*, 65 *N.J.* 462, 323 *A.*2d 489 (1974), the Court considered the New Jersey criminal laws dealing with obscenity. These laws did not define "obscenity" with the specificity required by *Miller v. California*, 413 *U.S.* 15, 93 *S.Ct.* 2607, 37 *L. Ed.*2d 419 (1973). *DeSantis, supra,* 65 *N.J.* at 472, 323 *A.*2d 489. The Court weighed whether it should judicially salvage the statute:

[I]t is entirely likely that the Legislature will expeditiously deal with the subject in light of all of the opinions in *Miller* and the related and ensuing cases both federal and state. In the meantime, however, we are confronted with the choice of nullifying *L.* 1971, *c.* 449, thereby leaving an interim void ... or supplying a stopgap constitutional interpretation.... [W]e take the latter course which we consider the more consonant with the legislative goals and our precedential judicial expressions.

[*Id.* at 472–73, 323 *A.*2d 489.]

Accordingly, the Court engrafted the *Miller* definition of obscenity onto New Jersey's obscenity laws. *Id.* at 473–74, 323 *A.*2d 489.

Furthermore, the Legislature has explicitly authorized courts to interpret terms contained in the New Jersey Code of Criminal Justice (Code); for example, *N.J.S.A.* 2C:1–2 provides principles of construction to guide courts in interpreting Code provisions. *N.J.S.A.* 2C:1–2(c) ("The provisions of the Code shall be construed according to the fair import of their terms but when the language is susceptible of differing constructions it shall be interpreted to further the general purposes stated in this section and the special purposes of the particular provision involved.").

Courts, however, will not unquestioningly construe statutes. In *State v. Miller*, for example, this Court declined to perform judicial surgery or to adopt a narrow construction of an ordinance prohibiting homeowners from posting signs containing political messages because the ordinance "so directly cuts to the heart of the First Amendment." *State v. Miller*, 83 *N.J.* 402, 414, 416 *A.*2d 821 (1980).

The Appellate Division's construction of *N.J.S.A.* 2C:34–7c was appropriate for several reasons. The Appellate Division

complied with its obligation to supply a definition of the type of identification sign that is lawful in order to "restore the statute to health." *Town Tobacconist, supra,* 94 *N.J.* at 104, 462 *A.*2d 573. That interpretation was necessary to prevent the statute from being unconstitutionally vague. The term "identification" could mean the establishment's name only, the establishment's name combined with a general description of the nature of its business, or its address, or both. Given that the Legislature enacted *N.J.S.A.* 2C:34–7c as part of a comprehensive package regulating sexually oriented businesses, it is reasonable to conclude that the Legislature would prefer the Court to adopt a "stopgap constitutional interpretation" rather than nullify the statute. Unlike the ordinance at issue in *Miller, supra, N.J.S.A.* 2C:34–7c does not "so directly cut[ ] to the heart of the First Amendment" because *N.J.S.A.* 2C:34–7c primarily concerns commercial, rather than political, speech. Furthermore, unlike the homeowners in *Miller,* sexually oriented businesses have multiple commercial means of expression available.

Consistent with *N.J.S.A.* 2C:1–2(c), which authorizes courts to interpret vague terms in the criminal code, the Appellate Division's construction gives "fair warning of the nature of the conduct proscribed." *N.J.S.A.* 2C:1–2(a)(4). As a result, sexually oriented businesses will not have to speculate as to what is permitted on their signs.

Additionally, the Appellate Division's construction of "identification" is consistent with several items used to identify businesses: name, location, description of location, description of premises, identity of proprietors and operators, hours of operation, and the type of business performed. The Appellate Division's interpretation allows a sexually oriented business to display the basic elements and function of its commercial identity.

Hamilton argues that the Appellate Division exacerbated the statute's vagueness by failing to define the "general nature of the business," the length of time in posting a political sign that is "temporary," and what constitutes a political sign. We conclude

that *N.J.S.A.* 2C:34–7c as construed is sufficiently clear and gives adequate notice to sexually oriented businesses to withstand this pre-enforcement challenge. A common sense interpretation of "general nature of the business" allows the establishment to advertise that it is a sexually oriented business and that it sells such products to adults.

We also hold that the term "temporary political sign" is not vague. "Temporary" denotes both physical and temporal impermanence. A person of average intelligence would understand "temporary political signs" to include signs that are not permanently affixed to the establishment's property and that speak to matters relating to the activities of the government, a politician, a political party, or a political issue. For those reasons, the statute is not facially unconstitutional.

## IV

Plaintiffs argue that *N.J.S.A.* 2C:34–7c is impermissibly under-inclusive because it exempts all businesses that are not sexually oriented. Therefore, according to plaintiffs, the statute violates their rights to equal protection by discriminating among speakers based solely upon the content of their speech. We disagree.

The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const.* amend. XIV, § 1. "Of course, the equal protection claim in this case is closely intertwined with First Amendment interests." *Police Dep't v. Mosley,* 408 *U.S.* 92, 95, 92 *S.Ct.* 2286, 2289, 33 *L. Ed.*2d 212, 216 (1972). "[T]he notion that a regulation of speech may be impermissibly *under-inclusive* is firmly grounded in First Amendment principles." *City of Ladue, supra,* 512 *U.S.* at 51, 114 *S.Ct.* at 2043, 129 *L. Ed.*2d at 45 (emphasis in original).

The Legislature may legitimately distinguish between the speech of sexually oriented businesses and non-sexually oriented businesses because "society's interest in [the former] type of

expression is of a wholly different, and lesser magnitude than the interest of untrammeled political debate." *American Mini Theatres, supra,* 427 *U.S.* at 70, 96 *S.Ct.* at 2456, 49 *L. Ed.*2d at 326. Thus, a state "may legitimately use the content of [sexually oriented] materials as the basis for placing them in a different classification from other motion pictures." *Id.* at 70–71, 96 *S.Ct.* at 2456, 49 *L. Ed.*2d at 326. This reasoning applies equally to the signs of sexually oriented businesses as to adult films. We conclude, therefore, that *N.J.S.A.* 2C:34–7c is not constitutionally infirm based on either equal protection or underinclusiveness concerns.

## V

■ Finally, plaintiffs contend that *N.J.S.A.* 2C:34–7c acts as a prior restraint. In general, "[t]he term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " *Alexander v. United States,* 509 *U.S.* 544, 550, 113 *S.Ct.* 2766, 2771, 125 *L. Ed.*2d 441, 450 (1993) (quoting M. Nambour, *Nambour on Freedom of Speech* § 4.03 at 4–14 (1984)); *Murray v. Lawson,* 138 *N.J.* 206, 221–22, 649 *A.*2d 1253 (1994), *cert. denied,* 515 *U.S.* 1110, 115 *S.Ct.* 2264, 132 *L. Ed.*2d 269 (1995). "The Supreme Court and lower federal courts have frequently noted that traditional concerns about prior restraint raised by forms of prepublication review such as the review procedure we permit today do not apply with the same force in the commercial speech context." *IMO Petition of Felmeister & Isaacs,* 104 *N.J.* 515, 550 n. 20, 518 *A.*2d 188 (1986).

■ One of the factors considered in determining if a restriction is a prior restraint is whether it "prevents the expression of a message. Thus, the Supreme Court has consistently found (often without discussion) that injunctions are prior restraints if they forbid entirely the publication of a message." *Murray, supra,* 138 *N.J.* at 222, 649 *A.*2d 1253. *N.J.S.A.* 2C:34–7c does not act as a prior restraint, however, because it does not

prohibit plaintiffs from expressing their message entirely. Rather, they are simply prohibited from expressing it on signs larger than those permitted by the statute. *See id.* at 223, 649 *A.*2d 1253 (finding that injunction did not act as prior restraint because it only "prohibited [defendants] from expressing [message] by picketing within the 300–foot zone that the injunction establishes"). More importantly, there is no prior restraint here because plaintiff has sought to restrain enforcement of the statute while the government has taken no specific act to restrain plaintiffs' expressions.

## VI

The power of this Court to declare a statute unconstitutional must be delicately exercised. *Harvey v. Board of Chosen Freeholders,* 30 *N.J.* 381, 388, 153 *A.*2d 10 (1959). The strong presumption of constitutionality that attaches to a statute can be rebutted only upon a showing that the statute's "repugnancy to the Constitution is clear beyond a reasonable doubt." *Ibid.; Franklin v. New Jersey Dept. of Human Servs.,* 111 *N.J.* 1, 17, 543 *A.*2d 1 (1988); *New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8–9, 292 *A.*2d 545 (1972). An observation made by Justice Holmes nearly a century ago is applicable to the present case. "Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, Kansas, & Texas Ry. Co. v. May,* 194 *U.S.* 267, 270, 24 *S.Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904).

We conclude that the strong presumption of the validity of *N.J.S.A.* 2C:34–7c has not been rebutted. We hold that the statute is constitutional. The judgment of the Appellate Division is therefore affirmed.

STEIN, J., concurring in part and dissenting in part.

The Court sustains, against a First Amendment challenge, the constitutionality of a statute that limits sexually oriented businesses throughout the State to two exterior signs, one giving notice that the premises are off limits to minors, and the other— an identification sign—restricted in size to forty square feet. The State contends that the statute is sustainable because its purpose is content-neutral. That is, the statute does not seek to regulate the constitutionally protected speech engaged in by sexually oriented businesses, but rather seeks to regulate the secondary effects of those businesses. The secondary effects that the State claims to be fostered by the sign regulation are traffic safety and the welfare of minors.

I do not necessarily disagree with the Court's conclusion that the challenged statute regulates only commercial speech and that its constitutionality should be determined on the basis of an intermediate standard of scrutiny. *Ante* at 265–69, 716 *A.*2d at 1142–44. Nor do I disagree with the Court's determination that "[t]he burden is on the State to establish the existence of the substantial governmental interest it sought to advance through the signage regulation." *Ante* at 269, 716 *A.*2d at 1144.

I part company with the Court when it elects to wink at the complete lack of legislative findings supporting the alleged governmental interest and sustains the statute without imposing on the State the burden of proving to the trial court that the alleged governmental interests are not pretextual. If those interests are pretextual, the Court would agree that the statute cannot be sustained. But the record evidence that the Court credits as supporting the alleged governmental interests is embarrassingly weak, and the State inexplicably did not supplement that evidence in the proceeding before the trial court. The Court ought not so readily compromise its responsibility to the interests protected by the First Amendment.

# I

The Court appropriately relies on *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 *U.S.* 557, 566, 100 *S.Ct.* 2343, 2346–47, 65 *L. Ed.*2d 341, 351 (1980), as a source of the standards for testing the validity of restrictions on commercial speech against First Amendment protections:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

The United States Supreme Court continues to insist on adherence to the *Central Hudson* standard in assessing the constitutionality of commercial speech regulations. In *Edenfield v. Fane*, 507 *U.S.* 761, 113 *S.Ct.* 1792, 123 *L. Ed.*2d 543 (1993), the Court invalidated under the First and Fourteenth Amendments Florida's ban on personal solicitation of prospective clients by certified public accountants. The Court observed:

> It is well established that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Products Corp.*, 463 *U.S.* 60, 71 n. 20, 103 *S.Ct.* 2875, 2883 n. 20, 77 *L. Ed.*2d 469, 480 n. 20 (1983). This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. Without this requirement, a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.
>
> . . . .
>
> "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 *U.S.* 415, 438, 83 *S.Ct.* 328, 340, 9 *L. Ed.*2d 405, 421 (1963) (citations omitted). Even under the First Amendment's somewhat more forgiving standards for restrictions on commercial speech, a State may not curb protected expression without advancing a substantial governmental interest. Here, the ends sought by the State are not advanced by the speech restriction, and legitimate commercial speech is suppressed. For this reason, the Board's rule infringes upon Fane's right to speak, as guaranteed by the Constitution.

[*Id.* at 770–71, 777, 113 *S.Ct.* at 1800, 1803–04, 123 *L. Ed.*2d at 555, 559 (citations omitted).]

The Court relies heavily on *City of Renton v. Playtime Theatres, Inc.*, 475 *U.S.* 41, 106 *S.Ct.* 925, 89 *L. Ed.*2d 29 (1986), which upheld the constitutionality of a city zoning ordinance that prohibited adult motion picture theatres from locating within 1000 feet of any residential zone, single- or multiple-family dwelling, church, park or school. The Court in *Renton* adhered to the *Central Hudson* mandate that the proponents of a legislative enactment regulating commercial speech must demonstrate that the regulation "is designed to serve a substantial government interest. . . ." *Id.* at 50, 106 *S.Ct.* at 930, 89 *L. Ed.*2d at 39. However, the Court rejected the Court of Appeals's holding that the ordinance was conclusory and speculative because the City had not conducted its own studies that reflected the need for the restriction. *Id.* at 50, 106 *S.Ct.* at 930, 89 *L. Ed.*2d at 39–40. The Court observed that the record reflected the City Council's reliance on studies produced by the City of Seattle focusing on the secondary effects of adult movie theaters, and also its reliance on the opinion of the Supreme Court of Washington in upholding the Seattle ordinance. *Id.* at 51–52, 106 *S.Ct.* at 931, 89 *L. Ed.*2d at 40. The Court concluded:

> We hold that Renton was entitled to rely on the experiences of Seattle and other cities, and in particular on the "detailed findings" summarized in the Washington Supreme Court's Northend Cinema opinion, in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses. That was the case here.

> [*Ibid.*]

This Court acknowledges that

> Unlike the city in *Renton,* however, when enacting *N.J.S.A.* 2C:34–7c, the Legislature did not place into the record the studies of this or any other jurisdiction; nor is there evidence that lawmakers relied on such studies. Similarly, the record does not reflect that the Legislature relied on decisional law from this or any other jurisdiction that discusses the detrimental secondary effects of sexually oriented businesses.

> [*Ante* at 270, 716 *A.*2d at 1144–45.]

Despite the obvious omission in the legislative record, the Court strains to find some semblance of documentation in the legislative record that identifies the governmental interests at stake and demonstrates that the sign restrictions significantly advance those interests.

Before examining the bits and pieces of the legislative record the Court relies on to sustain this statute, the Third Circuit Court of Appeals's recent analysis of the governmental burden in sustaining commercial speech restrictions is highly pertinent and provides a frame of reference for evaluating the soundness of the Court's analysis. In *Phillips v. Borough of Keyport*, 107 *F*.3d 164 (1997), the Third Circuit reversed as premature a District Court judgment sustaining the constitutionality of a local ordinance restricting adult entertainment uses to industrial districts and prohibiting them within 300 feet of residential zones, schools, churches, public playgrounds, swimming pools, parks and libraries, *id.* at 170–71, remanding the matter to the District Court for an evidentiary hearing in which the Borough would be required to identify the secondary governmental interests that justify the ordinance and to prove that the ordinance is reasonably tailored to promote those interests. *Id.* at 173. The court of appeals rejected the plaintiffs' contention that the ordinance could not be sustained because the Borough did not have before it at the time of adoption evidence that would sustain the constitutionality of the ordinance. The court stated:

> There is a significant difference between the requirement that there be a factual basis for a legislative judgment presented in court when that judgment is challenged and a requirement that such a factual basis have been submitted to the legislative body prior to the enactment of the legislative measure. We have always required the former; we have never required the latter. Whatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised. In reliance on this approach, most municipal and county councils throughout the land and some state legislatures do not hold hearings and compile legislative records before acting on proposed legislative measures. We perceive no justification in policy or doctrine for abandoning our traditional approach. Moreover, we believe that insistence on the

creation of a legislative record is an unwarranted intrusion into the internal affairs of the legislative branch of governments.

If a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber. A record like that presented to the town council in *Renton* can be easily and quickly assembled, and a requirement that this be done is unlikely to deter any municipal body bent on regulating or curbing speech. While we agree with appellants that the creation of a legislative record can have probative value on what the lawmakers had in mind when they acted, we do not understand why its absence should be controlling when the court is otherwise satisfied that the legislative measure has a content-neutral target.

[*Id.* at 178.]

Judge Rosenn dissented from that aspect of the court's opinion, expressing the view that under *Renton* consideration of pre-enactment evidence is a prerequisite to the constitutionality of a legislative restriction on commercial speech:

We are thus bound by both Supreme Court precedent and the precedent of our own circuit to require at least some evidence at the time of adoption before we sustain a restrictive ordinance of the type currently before us. The majority is of the view that the legislative body need have no factual basis before it at the time of the enactment of the ordinance, and that such a requirement is only necessary when the legislative judgment is challenged in court. If we look to cases decided in our sister circuits, we also see that no other circuit in this country has espoused the extreme, and I believe incorrect, position taken by the majority. Cases similar to the one at bar have been decided in the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits. Every one of these circuits has interpreted *Renton* to require pre-enactment evidence, and every one of these circuits has insisted upon such evidence before affirming the constitutionality of a restrictive zoning ordinance.

. . . .

At this juncture, the effects of adult entertainment establishments are so open and notorious that requiring legislative bodies to consult studies or other evidence confirming their deleterious impact may seem unnecessarily burdensome—just another hoop to jump through in the process of lawmaking. However, this requirement is not without purpose. It limits the risk that legislatures will impose restrictions on speech activities on the basis of supposed secondary effects that on closer scrutiny lack any evidentiary support, and it lends support to the representation that the content-neutral interest articulated by the lawmaking body was not merely pretextual and illicitly designed to suppress speech expression, even that constitutionally protected. I am as sympathetic as the majority to Keyport's well-intentioned purpose of preserving its community life, but the First Amendment cases show that it is "in those instances where protected speech grates most

unpleasantly against the sensibilities that judicial vigilance must be at its height." *Young v. American Mini Theatres,* 427 *U.S.* 50, 87, 96 *S.Ct.* 2440, 2460, 49 *L. Ed.*2d 310, 336 (1976)(Stewart, J., dissenting). Because the Borough of Keyport had no evidence of deleterious secondary effects before it when it enacted its restrictive zoning ordinance, our jurisprudence requires that we strike down the ordinance as unconstitutional.

[*Id.* at 189–90 (citations and footnotes omitted).]

## II

The Court cites three sources in its analysis of whether the State has substantiated the governmental interests it seeks to advance through the signage regulation contained in *N.J.S.A.* 2C:34–7(c). The Court first acknowledges that one of those sources, the position statement by the Concerned Women for America that was considered by the Assembly Judiciary Law and Public Safety Committee, does not address signage, traffic safety, or harm to minors. Its focus is solely on "the connection between violent, sexually explicit material and violent crime...." *Ante* at 272, 716 *A.*2d at 1145.

The Court's opinion breaks new constitutional ground, however, when it purports to rely on the floor speech delivered by the bill's sponsor, Assemblywoman Crecco, as constituting legislative history that establishes the existence of governmental interests sought to be advanced by the signage regulation. The full text of that speech follows:

Thank you, Mr. Speaker. I rise today to urge you to vote for the Assembly Committee Substitute to A–252/842 and to offer floor amendments.

The amendments would make this committee substitute consistent with Senate Bill 342, sponsored by Senator Gormley.

This legislation regulates the operations of sexually oriented businesses, such as "juice bars." These establishments would not be allowed to operate within 1,000 feet of any school, playground, park or place of worship, or within 1,000 feet of any residential area.

This bill does not affect the right of municipalities to adopt zoning ordinances establishing so called "combat" zones for the clustering of sexually oriented businesses.

Additionally, the bill mandates the external appearance of sexually oriented businesses be surrounded by 50–foot wide perimeter buffers made up of plantings, and limits the number and size of signs.

This 50 foot distance restriction would help to preserve neighborhoods and to prevent urban blight.

The buffer plantings would help to establish a distance between businesses and minors who may be in the area. These would also eliminate embarrassment by citizens who might be walking by.

Sign restrictions would be advantageous because multiple signs distract motorists and cause accidents.

This bill also addresses the use of prohibited enclosures or private booths for the purpose of viewing pornographic motion pictures, and other photographic representations which depict or describe sexual activity. This prohibition would help to prevent sexually transmitted diseases.

Violators would be guilty of a crime of the fourth degree, which is punishable by a term of imprisonment of up to 18 months or a fine of up to $7,500 or both.

We need to put the brakes on these sorts of element [sic] in all municipalities in the State of New Jersey. Parents are concerned about their children being exposed to these types of perverted establishments and their sordid activities.

Owners of these businesses need to know that they will not be able to break the law and get away with it.

I ask for your favorable consideration of this bill and the amendments. Thank you.

[*Floor Speech in Favor of Assembly Bill 252* (Dec. 15, 1994)(statement of Marion Crecco, Assemblywoman).]

The obvious irrelevance of Assemblywoman Crecco's speech to the issue before us is simply incontrovertible, except to the extent that it demonstrates the Court's willingness to cite to the flimsiest shred of legislative history to sustain this statute. Only two sentences in the speech relate at all to the secondary effects advanced by the State: traffic safety and concern for minors.

Sign restrictions would be advantageous because multiple signs distract motorists and cause accidents.

We need to put the brakes on these sorts of element [sic] in all municipalities in the State of New Jersey. Parents are concerned about their children being exposed to these types of perverted establishments and their sordid activities.

Obviously, neither statement has any evidentiary support. Although the latter statement mentions children, its reference to "perverted establishments and their sordid activities" more persuasively suggests that the statute is designed to regulate the content of speech rather than to control secondary effects. In any event, the Court's reliance on the speech for any purpose ignores the Supreme Court's admonition in *Renton:* "What motivates one

legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Renton, supra,* 475 *U.S.* at 48, 106 *S.Ct.* at 929, 89 *L. Ed.*2d at 38 (quoting *United States v. O'Brien,* 391 *U.S.* 367, 384, 88 *S.Ct.* 1673, 1683, 20 *L. Ed.*2d 672, 684 (1968)).

Finally, the Court relies on the legislative history of *N.J.S.A.* 2C:33–12.2, a statute that the Legislature considered during approximately the same time frame in which it enacted *N.J.S.A.* 2C:34–7(c). That statute makes it unlawful for the operator of a sexually oriented business to offer for public use booths, screens, enclosures or other devices that facilitate sexual activity by patrons.

The Court acknowledges that the legislative history of *N.J.S.A.* 2C:33–12.2 was not part of the trial record in this proceeding, but was included in the State's Appellate Division appendix. *Ante* at 273, 716 *A.*2d at 1146. The Court further acknowledges that the legislative history of *N.J.S.A.* 2C:33–12.2 demonstrates the Legislature's concern with the secondary effects of sexually oriented businesses that provide private viewing booths for their patrons. *Ante* at 273–74, 716 *A.*2d at 1146. What the Court fails to acknowledge is that the legislative history of *N.J.S.A.* 2C:33–12.2 proffered by the State can be scoured from beginning to end without discovering *any evidence whatsoever* that even remotely suggests that *N.J.S.A.* 2C:34–7(c) advances the governmental interest in promoting traffic safety or in protecting minors. The Court's reliance on that legislative history is diversionary and unjustified.

### III

The hard fact is that this record not only contains insufficient evidence to sustain this statute—it contains no evidence at all. The State could not help but be aware of the deficiencies in the record. Inexplicably, the State failed to avail itself of the opportunity to introduce supplemental supporting evidence before the

trial court of the secondary governmental interests served by the statute and of how the statute advances those interests. That the State could have produced evidence sufficient to sustain the statute I have little doubt. I have no doubt, however, that for the Court to comb this record in a vain attempt to find evidence that the State simply has failed to produce is both unseemly and inappropriate. In short, that is not our job.

In sustaining this statute we ignore not only federal precedents but our own as well. In *Zilinsky v. Zoning Board of Adjustment of Verona*, 105 *N.J.* 363, 371, 521 *A.*2d 841 (1987), we acknowledged that when a fundamental right is infringed by ordinance a municipality has the burden of articulating the governmental objectives underlying the ordinance either in the legislative process or by offering testimony at a court hearing. In *Bell v. Township of Stafford*, 110 *N.J.* 384, 541 *A.*2d 692 (1988), we invalidated a municipal ordinance that prohibited billboards throughout the municipality precisely because the Township failed to demonstrate the governmental interests advanced by the ordinance. We observed:

> In applying the test for determining the constitutional validity of an enactment that restricts or impinges on freedom of speech and expression, we are mindful that ordinarily legislative enactments are presumed to be valid and the burden to prove invalidity is a heavy one. . . .
>
> Nevertheless, if an enactment directly impinges on a constitutionally protected right, the presumption in favor of its validity disappears. Courts are far more demanding of clarity, specificity and restrictiveness with respect to legislative enactments that have a demonstrable impact on fundamental rights.
>
> . . . .
>
> The ordinance fails to reveal either its particular governmental objectives or its factual underpinnings. As the Appellate Division noted, the record is almost completely devoid of any evidence concerning what interests of Stafford are served by the ordinance and the extent to which the ordinance has advanced those interests. Because the exercise of first amendment rights and freedom of speech are at stake, the municipality cannot seek refuge in a presumption of validity. It clearly had the burden to present and confirm those compelling legitimate governmental interests and a reasonable factual basis for its regulatory scheme in order to validate its legislative action. Its failure to do so is fatal.
>
> [*Id.* at 394–96, 541 *A.*2d 692 (citations omitted).]

In *State v. Miller*, 83 *N.J.* 402, 416 *A.*2d 821 (1980), we invalidated a municipal ordinance that severely restricted the content of signs in residential areas and limited the size of such signs to not more than six square feet. We noted that "[t]o withstand the strict constitutional scrutiny required here, the restriction on signs must be tied to a compelling municipal interest...." *Id.* at 414, 416 *A.*2d 821. We also observed that "[l]imitations on the size of a sign may be imposed if the allowable square footage is not determined in an arbitrary manner.... Inadequate sign dimensions may strongly impair the free flow of protected speech." *Id.* at 416, 416 *A.*2d 821.

No evidence in this record suggests any rational basis for the forty-foot limitation on the size of signs permitted for sexually oriented businesses. That a rational basis for that limitation could have been advanced is beside the point. The legislative record on that issue is non-existent, and for all this Court knows the size limitation was plucked out of thin air.

These are not idealistic or academic concerns. The Fifth Circuit Court of Appeals explained the interests at stake in *SDJ, Inc. v. City of Houston*, 837 *F.*2d 1268, 1274 (1988):

> It is true that the effect on speech here is said to be incidental to a regulation aimed at the secondary effects of a business whose activities are within the legitimate scope of the state's police power. Yet, unlike our review under a standard of rationality, we will not hypothesize such an objective or accept a naked assertion. Rather, we intrude into the regulatory decision process to the extent that we insist upon objective evidence of purpose—a study or findings. Insisting upon findings reduces the risk that a purported effort to regulate effect is a mask for regulation of content. That is, evidence of legitimate purpose is supported by proof that secondary effects actually exist and are the result of the business subject to the regulation.... Our task in setting the level of review is to strike for that point of equilibrium that vindicates first amendment values at the least cost to a state's decisional arrangements.

## IV

I would remand this matter to the Law Division and require the State to prove its case. The record before the Court cannot possibly sustain the constitutionality of the statute under review. For the Court to strain to uphold this statute on the record

presented disserves the fundamental and enduring interests protected by the First Amendment.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, and COLEMAN—6.

*Concur in part; dissent in part*—Justice STEIN—1.