NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0417-12T4

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

     Petitioner-Respondent,

v.

CREST ULTRASONICS and
J. MICHAEL GOODSON, CEO
and INDIVIDUALLY,

     Respondents-Appellants.

_____

APPROVED FOR PUBLICATION

January 7, 2014

APPELLATE DIVISION

Argued December 17, 2013 – Decided January 7, 2014

Before Judges Messano, Sabatino, and Hayden.

On appeal from the New Jersey Department of Labor and Workforce Development, Agency Ref. No. GE-2619-0911-SIM.

Richard W. Berg argued the cause for appellants (The Law Office of Robin Kay Lord, LLC, attorneys; Robin Kay Lord and Mr. Berg, of counsel and on the brief).

Robert M. Strang, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Strang, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

In this case of first impression, appellants challenge the constitutionality of N.J.S.A. 34:8B-1, a measure the Legislature enacted in 2011 after the Governor's conditional veto of a more sweeping version of the proposed law. Subject to certain exceptions that do not apply here, the statute bars employers seeking to fill job vacancies in this State from purposefully or knowingly publishing advertisements stating that job applicants must be currently employed in order for their applications to be accepted, considered, or reviewed.

Appellants are a New Jersey company and its chief executive officer. Seeking to fill a job vacancy, they admittedly posted a newspaper ad containing such prohibited language shortly after the law became effective. Appellants were consequently fined by the Department of Labor and Workforce Development (the "Department") pursuant to the statute and its implementing regulations. In contesting that fine, appellants contend that N.J.S.A. 34:8B-1 improperly infringes upon their rights of free speech, in violation of the First Amendment of the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.

For the reasons set forth in this opinion, we reject appellants' claims of unconstitutionality. Applying the well-established test for evaluating content-based restrictions on

commercial speech set forth in <u>Central Hudson Gas & Electric Corp. v. Public Service Commission</u>, 447 <u>U.S.</u> 557, 561, 100 <u>S. Ct.</u> 2343, 2349, 65 <u>L. Ed.</u> 2d 341, 348 (1980), we conclude that the statute is narrowly tailored to advance a limited, but nevertheless substantial, governmental objective in maximizing the opportunities for unemployed workers to have their qualifications presented to prospective employers. The modest restrictions that the State has placed upon job advertising under the statute are constitutionally valid, even though employers might not consider or ultimately hire most of the unemployed applicants who respond to such job postings.

We therefore affirm the Department's enforcement of the statute and its finding of a violation. However, we remand the matter to the agency for reconsideration of appellants' fine, in light of the distinctive circumstances presented by this precedential litigation.

## I.

The parties have stipulated to the relevant facts. Appellants are Crest Ultrasonics ("Crest"), a New Jersey corporation that manufactures and distributes ultrasonic precision cleaning equipment, and its chief executive officer, J. Michael Goodson. The company needed to replace its Service

Manager[1] at its facility in Ewing, an employee who had served in that position for over twenty years. Appellants regarded the vacant position as one that "requires technical knowledge that is both current and up to date."

After several unsuccessful attempts to fill the position, appellants placed an employment advertisement in the classified section of the Burlington County Times. The short text of the ad, which appeared in the newspaper on August 31, 2011, read as follows:

> SERVICE MANAGER
> 65K-75K. Must be currently employed.
> Technically competent. Customer Friendly
> CREST ULTRASONICS
> EWING TWP, NJ
> HR@crest-ultrasonics.com
>
> [(Emphasis added).]

That same day, an individual[2] placed a phone call to the Department to report concerns about the ad. The individual followed up with a letter, asking the Department "if it is legal to place an ad in the unemployment section of the newspaper that

---

[1] The parties' stipulation of facts also refers to the position as that of a "Service Manager Receiver."

[2] The individual who reported the situation to the Department is not a party to this case. The record does not clearly indicate that he was a potential job applicant, although the gist of his letter suggests that he felt he had been unfairly discriminated against as an unemployed person.

as a condition of applying for a position you must be currently employed."

In response to the citizen's complaint, the Department assigned an investigator to review the circumstances. The investigator twice visited appellants' offices, reviewing various payroll and other company records.

After the investigation was completed, the Department sent Crest and Goodson a letter notifying them of its determination that their ad violated N.J.S.A. 34:8B-1, and that they were consequently being fined $1,000 pursuant to N.J.S.A. 34:8B-2. The letter advised appellants that they could contest the assessed fine by detaching and returning a form enclosed with the notice letter within sixteen days.

The Department subsequently issued an administrative order reiterating the $1,000 penalty against appellants, noting that they had failed to respond to the earlier notice. Appellants then filed an administrative appeal with the Department, asserting that the fine was improper because "the law [N.J.S.A. 34:8B-1] is unconstitutional."

The parties' counsel thereafter jointly developed and agreed upon a stipulation of facts. The stipulation consisted of nineteen paragraphs, including a final paragraph which stated that the parties had agreed that the facts recited therein,

along with various specified exhibits, would "serve as the 'written record' pursuant to N.J.A.C. 12:67-1.5[3] so the matter may proceed to the Commissioner [of the Department] for a Final Administrative decision." The parties chose this route in order to "eliminate[] the cost and delay associated with transmitting the case to the Office of Administrative Law when there existed no necessity for fact-finding, and the only issue was the constitutionality of N.J.S.A. 34:8B-1."

The Commissioner subsequently issued a final administrative decision on August 17, 2012, upholding the $1,000 penalty assessed against appellants. The Commissioner expressly declined to address appellants' contention that N.J.S.A. 34:8B-1 is unconstitutional. On that subject, the Commissioner noted that "the final responsibility to pass upon the

---

[3] N.J.A.C. 12:67-1.5 states, in pertinent part, that:

> [w]hen the Director [of the Division of Wage and Hour Compliance] assesses an administrative penalty . . . the employer shall have the right to file an appeal with the Commissioner [of the Department]. . . . An appeal must be received by the Commissioner within 15 business days following receipt by the employer of the notification[.] . . . The Commissioner shall decide any appeal . . . on the written record or shall provide a hearing pursuant to the Administrative Procedure Act . . . and the Uniform Administrative Procedure Rules[.]

constitutionality of a given piece of legislation rests in the courts," adding that "it is the duty of the various [S]tate agencies and administrative bodies to accept a legislative act as constitutional until such time as it has been declared to be unconstitutional by a qualified judicial body." Hence, the Commissioner stated that he had based his decision to uphold the $1,000 fine "solely upon the stipulated facts and attached exhibits, which together comprise the record in this matter."

This appeal ensued. Fundamentally, appellants maintain that the statute's prohibitions are improper content-based infringements upon their rights of free speech under the federal and state constitutions. They also allege violations of due process and other constitutional principles. The Department counters that the statute promotes legitimate and significant governmental interests, and that it has been crafted in a measured fashion that does not unduly infringe upon the expressive freedoms of employers or other constitutional rights.

II.

A.

N.J.S.A. 34:8B-1, and the companion penalty provision in N.J.S.A. 34:8B-2, were enacted into law in March 2011. They became effective on June 1, 2011. The statute has its genesis

in A-3359, a bill which was introduced in October 2010.[4]  See N.J. State Law Library, Legislative History Checklist to N.J.S.A. 34:8B-1.[5]  The bill was approved by the Assembly Labor Committee on October 14, 2010, and initially passed the full Assembly later that same month.  The provision was also approved by the Senate Labor Committee and a subsequent vote of the full Senate in November 2010.

The bill was conditionally vetoed by Governor Chris Christie on January 11, 2011.  See Governor's Conditional Veto to Assembly Bill No. 3359 (Jan. 11, 2011).  In his veto message, Governor Christie stated that he "share[d] the sponsors' interest in removing barriers to employment for people who are actively seeking work."  Id. at 1.  However, he noted that "the bill, as currently drafted, is vague and confusing."  Ibid. Governor Christie accordingly recommended twelve proposed changes to the bill.[6]  Id. at 3-5.  All twelve of Governor

---

[4] An identical bill, S-2388, was introduced in the Senate.

[5] Available at http://law.nj.statelib.org/law_files/njlh/lh2011/L2011c40.pdf.

[6] Governor Christie's conditional veto message recommended amendments to the bill that included a lowering of the proposed fine for first-time violations from $5,000 to $1,000.  The Governor also proposed adding the final two paragraphs to subsection (c), discussed infra at Part II(B)(4), which clarified that employers could still include in their job advertisements other prerequisites for employment, such as
(continued)

A-0417-12T4

Christie's proposed amendments were thereafter adopted by the Legislature without alteration. Subsequently, the final version of the bill was enacted into law as L. 2011, c. 40, on March 29, 2011. See Legislative History Checklist, supra.

The statute's core substantive provision, N.J.S.A. 34:8B-1, entitled "Restrictions upon use of employment as qualification for position vacancies," states:

> Unless otherwise permitted by the provisions of Title 11A of the New Jersey Statutes[7] or any other law, rule, or regulation, no employer or employer's agent, representative, or designee shall knowingly or purposefully publish, in print or on the Internet, an advertisement for any job vacancy in this State that contains one or more of the following:
>
> a. Any provision stating that the qualifications for a job include current employment;
>
> b. Any provision stating that the employer or employer's agent, representative, or designee will not consider or review an application for employment submitted by any job applicant currently unemployed; or
>
> c. Any provision stating that the employer or employer's agent, representative, or designee will only consider or review

_____

(continued)
licensing or education, and could also note in an ad that they would only consider internal applicants.

[7] The reference to Title 11A concerns the State's civil service laws, N.J.S.A. 11A:1-1 to 12-6, which are not at issue in this case involving an advertisement for private employment.

applications for employment submitted by job applicants who are currently employed.

Nothing set forth in this section shall be construed as prohibiting an employer or employer's agent, representative, or designee from publishing, in print or on the Internet, an advertisement for any job vacancy in this State that contains any provision setting forth any other qualifications for a job, as permitted by law, including, but not limited to, the holding of a current and valid professional or occupational license, certificate, registration, permit or other credential, or a minimum level of education, training or professional, occupational or field experience.

In addition, nothing set forth in this section shall be construed as prohibiting an employer or employer's agent, representative, or designee from publishing, in print or on the Internet, an advertisement for any job vacancy that contains any provision stating that only applicants who are currently employed by such employers will be considered.

[(Emphasis added).]

The companion penalty provision in N.J.S.A. 34:8B-2 provides that:

a. Any employer who violates this act [N.J.S.A. 34:8B-1] shall be subject to a civil penalty in an amount not to exceed $1,000 for the first violation, $5,000 for the second violation and $10,000 for each subsequent violation, collectible by the Commissioner of Labor and Workforce Development in a summary proceeding pursuant to the "Penalty Enforcement Law of 1999," P.L. 1999, c. 274 [N.J.S.A. 2A:58-10 to -12].

> b. Nothing set forth in this act shall be construed as creating, establishing or authorizing a private cause of action by an aggrieved person against an employer who has violated, or is alleged to have violated, the provisions of this act.

> [(Emphasis added).]

This legislation was enacted during the midst of a national recession that indisputably caused a significant adverse impact upon the economy and the workforce in the State of New Jersey. We can readily take judicial notice that the bill became law in a context where unemployment levels in this State had been rising, businesses were widely downsizing, and new job opportunities were waning.[8] These conditions had produced a harsh reality in which many workers remained on the unemployment rolls for prolonged periods of time and were finding it

---

[8] When the legislation was first introduced in October 2010, unemployment rates in New Jersey hovered at approximately 9.2 percent. See State of New Jersey Dep't of Labor & Workforce Dev., Employers Add 10,000 Jobs in November; Unemployment Rate Remains at 9.2 Percent (Dec. 15, 2010), available at http://lwd.dol.state.nj.us/labor/lwdhome/press/2010/20101215_une mployment_release.html.

By the time the legislation became effective in June 2011, "New Jersey's unemployment rate [had] edged higher . . . to 9.5 percent." See State of New Jersey Dep't of Labor & Workforce Dev., Private Sector Job Growth Continued in June Adding 6,400 Jobs (July 21, 2011), available at http://lwd.dol.state.nj.us/labor/lwdhome/press/2011/20110721_une mployment_release.html.

In presenting this background information, we do not mean to suggest that the statute would become constitutionally invalid in better economic times.

difficult to be considered for and obtain new positions.  At the same time, certain employers that did have vacant positions apparently were disinclined to hire persons who were currently jobless, preferring instead to focus their hiring on the pool of applicants who currently held other positions.

During the Assembly session of October 25, 2010 cited in the Department's brief, one of the bill's sponsors, Assemblyman Peter J. Barnes III, underscored the importance of promoting the ability of currently unemployed persons to be considered for vacant jobs.  When such jobless persons become discouraged from applying for work, Barnes asserted, both they and potential employers are harmed, through the elimination of a whole segment of the population that might otherwise be qualified to do the tasks required.

Assemblyman Barnes noted that it had been his original intention to seek to amend the New Jersey Law Against Discrimination, <u>N.J.S.A.</u> 10:5-1 to -42, to prohibit employers from discriminating against unemployed job applicants.  Rather than pursuing a more ambitious measure directed to the merits of an employer's hiring decisions, he compromised by introducing this narrower bill instead.[9]

---

[9] <u>See</u> Recording of Oct. 25, 2010 Assembly Session, <u>available at</u> http://www.njleg.state.nj.us/media/archive_audio.asp?SESSION=201
(continued)

A-0417-12T4

The official statement accompanying the bill reads as follows:

> This bill prohibits an employer or employer's agent, representative, or designee to publish, in print or on the Internet, an advertisement for any job vacancy that prohibits, announces or suggests that unemployed individuals need not apply for a job vacancy. The bill provides for the imposition of civil penalties, for a violation of the bill, in an amount not to exceed $5,000 for the first violation, or $10,000 for each subsequent violation, collectible by the Commissioner of Labor and Workforce Development.
>
> [Sponsor's Statement to Assembly Bill No. A3359 (Oct. 7, 2010).]

Apart from these particular aspects of the advertising statute's legislative history, the Department contends that N.J.S.A. 34:8B-1 "shares a common purpose" with the Unemployment Compensation Act, N.J.S.A. 43:21-2 to -24.30. The latter statute requires unemployed residents to seek jobs actively in order to qualify for unemployment benefits. See N.J.S.A. 43:21-4(c)(1) ("An unemployed individual shall be eligible to receive benefits with respect to any week eligible only if . . . [t]he individual is able to work, and is available for work, and has demonstrated to be actively seeking work.") (emphasis added).

(continued)
2 (click Select Session, 2010-2011, Assembly Session, Monday, October 25, 2010, 1:00 p.m., Assembly Chambers, View).

A-0417-12T4

According to the Department, "[t]hese statutes are mutually supportive and should be read [in pari materia] as part of an overall legislative scheme."[10]

Other jurisdictions have recently enacted similar or more expansive laws designed to aid unemployed workers in their job searches. See generally Jennifer Jolly Ryan, Repairing Damaged Goods: Federal and State Legislation Prohibiting Employers from Making Current Employment a Job Requirement, 14 Rutgers Race & L. Rev. 54 (2013) (canvassing the enacted and pending provisions in other jurisdictions). In 2012, Oregon passed a statute worded very similarly to N.J.S.A. 34:8B-1, which prohibits employers from publishing job ads that make current employment a

---

[10] The legislative history for N.J.S.A. 34:8B-1 does not refer explicitly to the Unemployment Compensation Act, nor does it state that the former was specifically enacted to serve as a companion provision to N.J.S.A. 43:21-2. However, we accept the Department's argument that there is some degree of implicit connection between the statutes. The statutes do relate to the same general subject matter, i.e., unemployment. Moreover, the new statute's effort to lessen obstacles for jobless persons to regain employment does tie in with the policies set forth in the Title 43 provisions. See Burt v. W. Jersey Health Sys., 339 N.J. Super. 296, 304 (App. Div. 2001) ("In construing statutes relating to the same subject matter, we must strive to harmonize them. Thus, 'statutes in pari materia, are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent.'") (internal citations omitted) (quoting In the Matter of J.W.D., 149 N.J. 108, 115 (1997)). However, for the reasons that follow, infra, we do not perceive this connection between the two sets of laws, although it is helpful to the State's defense, to be the linchpin of the First Amendment analysis.

hiring qualification.[11]  That same year, the District of Columbia adopted a provision that not only bans such "need not apply" advertising content, but goes further and also makes it illegal to refuse to hire or consider hiring a potential employee based upon his or her unemployed status.[12]  The City of New York has likewise adopted a comparable ban.[13]  We were advised at oral argument that Rhode Island is considering similar legislation, but is awaiting the outcome of the present appeal and the resolution of this constitutional challenge to the New Jersey provisions.

As Professor Ryan's journal article has noted, these various laws have been enacted in recognition that "[t]he

---

[11] See 2012 Or. Laws Ch. 85, § 2(1)(a) ("[A]n employer, the employer's agent, representative or designee or an employment agency may not knowingly or purposefully publish in print or on the Internet an advertisement for a job vacancy in this state that provides that . . . [t]he qualifications for a job include current employment.").

[12] See D.C. Code § 32-1362 (2012) ("No employer or employment agency shall . . . [p]ublish, in print, on the Internet, or in any other medium, an advertisement or announcement for any vacancy in a job for employment that includes . . . [a]ny provision stating or indicating that an individual's status as unemployed disqualifies the individual for the job.").

[13] See N.Y.C. Admin. Code § 8-107(21)(a)(2)(a) (2012) ("[N]o employer, employment agency, or agent thereof shall publish, in print or in any other medium, an advertisement for any job vacancy in this city that contains . . . [a]ny provision stating or indicating that being currently employed is a requirement or qualification for the job.").

undisputed proof is that the longer one is unemployed, the less likely one will find a job." Ryan, supra, 14 Rutgers Race & L. Rev. at 59 & n.32. "When employers require job-seekers to be currently employed before even considering them for available job openings, unemployed workers continue to face disproportionate circumstances as their period of unemployment grows longer." Id. at 59-60, 60 n.37. Some employers, however, perceive that currently jobless persons are less likely to be suitable applicants because they may lack current skills, or because they may have lost their previous jobs due to poor performance. See id. at 60-62. In addition, because of the surplus of supply in the labor market, hiring employers may already be flooded with more than sufficient applications from currently employed candidates. Id. at 60.

B.

We now turn to the merits of appellants' constitutional challenge. In doing so, we bear in mind that "[t]he power of [a] [c]ourt to declare a statute unconstitutional must be delicately exercised." Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 285 (1998) (citing Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 388 (1959)), cert. denied, 527 U.S. 1021, 119 S. Ct. 2365, 144 L. Ed. 2d 770 (1999). "The strong presumption of constitutionality that attaches to a statute can

be rebutted only upon a showing that the statute's 'repugnancy to the Constitution is clear beyond a reasonable doubt.'" Ibid. (quoting Harvey, supra, 30 N.J. at 388).

Appellants' claims of invalid infringement of their free speech rights trigger the application of several long-standing principles of First Amendment law.[14]  At the outset, it is undisputed that appellants' classified advertising is a species of commercial speech rather than political speech.  In Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 385, 93 S. Ct. 2553, 2558, 37 L. Ed. 2d 669, 677 (1973), the United States Supreme Court observed that help-wanted ads conveying "no more than a proposal of possible employment" were "classic examples of commercial speech."

---

[14] We discern no independent test for assessing the validity of commercial speech restrictions under the New Jersey Constitution.  "Because we ordinarily interpret our State Constitution's free speech clause to be no more restrictive than the federal free speech clause, '[w]e rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution.'"  Hamilton Amusement Ctr., supra, 156 N.J. at 264 (internal citations omitted) (quoting Karins v. City of Atlantic City, 152 N.J. 532, 547 (1998)).  The federal Central Hudson test has traditionally guided the commercial speech cases litigated in our State.  See, e.g., Twp. of Pennsauken v. Schad, 160 N.J. 156, 176 (1999) (applying the Central Hudson framework to analyze an ordinance involving commercial speech).

It is equally clear that the prohibitions in N.J.S.A. 34:8B-1 are content-based, not content-neutral. Appellants do not claim, however, that the statute is a form of "viewpoint" discrimination, a circumstance which can trigger, in some contexts, an even higher level of judicial scrutiny than that which applies to content-based restrictions.[15]

In traditional First Amendment jurisprudence, "[w]hen a statute favors one speaker over another, it is a form of content-based regulation. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

---

[15]    For an explanation of the analytical differences between viewpoint-based and content-based restrictions on speech, compare State v. DeAngelo, 197 N.J. 478, 486-87 (2009) ("As a general rule, laws that by their terms distinguish favored speech on the basis of ideas or views expressed are content-based.") (internal citations and quotation marks omitted), with Rosenberger v. Rectors & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S. Ct. 2510, 2516, 132 L. Ed. 2d 700, 712 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.") (emphasis added) (citations omitted).

However, even viewpoint-based regulations in the commercial realm are commonly analyzed using intermediate scrutiny. See generally Greater New Orleans Broad. Ass'n v. United States, 527 U.S. 173, 119 S. Ct. 1923, 144 L. Ed. 2d 161 (1999). By way of an illustration, N.J.S.A. 34:8B-1 might be more vulnerable to constitutional attack if it prohibited business associations or advocacy groups from publishing ads expressing policy views that the government should not meddle in the labor market and in private hiring processes.

restriction." Chez Sez VIII, Inc. v. Poritz, 297 N.J. Super. 331, 342 (App. Div. 1997) (internal citations and quotation marks omitted).

Content-based restrictions on political speech are considered "presumptively invalid" unless they are able to withstand a strict scrutiny analysis. R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305, 317 (1992). However, courts have customarily declined to apply an equally stringent review standard to content-based regulations of commercial speech, instead utilizing the four-part intermediate scrutiny framework of Central Hudson, discussed infra.[16]

---

[16] See, e.g., Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 956-57 (9th Cir. 2012) ("We evaluate content-based restrictions on noncommercial speech under strict scrutiny. We analyze similar restrictions on commercial speech under a more lenient standard, as set forth in Central Hudson[.]") (citations omitted); B&B Coastal Enters., Inc. v. Demers, 276 F. Supp. 2d 155, 163 (D. Me. 2003) ("In the First Circuit, regardless of whether a regulation of commercial speech is content-based, the test put forth in the Supreme Court's Central Hudson opinion, not strict scrutiny, will be applied to evaluate the regulation's constitutionality."); N. Olmstead Chamber of Commerce v. City of N. Olmstead, 86 F. Supp. 2d 755, 769 (N.D. Ohio 2000) ("Content-based restrictions on truthful, nonmisleading commercial speech receive intermediate scrutiny with bite under the four-part Central Hudson test."); Larson v. City & Cnty. of San Francisco, 123 Cal. Rptr. 3d 40, 58 (2011) ("[B]ecause regulation of commercial speech based on content is viewed as less problematic than a content-based regulation of non-commercial speech, content-based restrictions on commercial
(continued)

In its 1980 seminal opinion in Central Hudson, the United States Supreme Court described commercial speech as "expression related solely to the economic interests of the speaker and its audience." Central Hudson, supra, 447 U.S. at 561, 100 S. Ct. at 2349, 65 L. Ed. 2d at 348 (citing Va. Pharm. Bd. v. Va. Citizens Consumer Council, 435 U.S. 748, 762, 96 S. Ct. 1817, 1825-26, 48 L. Ed. 2d 346, 359 (1976)). "[B]oth the United States Supreme Court and [the New Jersey Supreme Court] have held that the United States Constitution accords less protection to commercial speech than to other constitutionally-guaranteed expression." Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 72 (1985) (citing Central Hudson, supra, 447 U.S. at 563, 100 S. Ct. at 2350, 65 L. Ed. 2d at 349). "That protection applies only insofar as the speech conveys facts that facilitate honest commercial transactions." Ibid.

In Central Hudson, the Court maintained this critical distinction between speech concerning solely commercial transactions and other forms of speech that are entitled to more stringent protections, by delineating a four-part analytical framework for assessing the validity of restrictions placed on

(continued)
speech are evaluated under an intermediate scrutiny test.") (citations omitted).

commercial speech.  The four elements of the <u>Central Hudson</u> test are as follows:

> At the outset, we must determine whether the expression is protected by the First Amendment.  [1] For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  [2] Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is more extensive than is necessary to serve that interest.
>
> [<u>Central Hudson</u>, <u>supra</u>, 447 <u>U.S.</u> at 566, 100 <u>S. Ct.</u> at 2351, 65 <u>L. Ed.</u> 2d at 351.]

C.

We are therefore guided by <u>Central Hudson</u>'s four-part intermediate scrutiny test in resolving the present appeal.  In applying that test, we are mindful that the United States Supreme Court issued an opinion in <u>Sorrell v. IMS Health Inc.</u>, 564 <u>U.S.</u> __, 131 <u>S. Ct.</u> 2653, 180 <u>L. Ed.</u> 2d 544 (2011), indicating that a majority of the justices believed that a more rigorous test of "heightened judicial scrutiny" should be applied to certain forms of restrictions on commercial speech.

The Court ruled in <u>Sorrell</u> that a Vermont statute restricting the sale, use, and disclosure of pharmacy records that revealed the prescription practices of individual doctors throughout that state to pharmaceutical manufacturers "must be

subjected to heightened judicial scrutiny." Id. at __, 131 S. Ct. at 2659, 180 L. Ed. 2d at 551. In so ruling, the Supreme Court rejected Vermont's argument that the statute was merely a commercial regulation and thus subject to only intermediate scrutiny. The Court noted that "[t]he First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys. . . . Commercial speech is no exception." Id. at __, 131 S. Ct. at 2664, 180 L. Ed. 2d at 556 (internal citations and quotation marks omitted). However, despite this pronouncement, the Court still applied the traditional Central Hudson analysis for restrictions on commercial speech (i.e., intermediate, not heightened, scrutiny), to the facts in Sorrell, and did not articulate how the "heightened scrutiny" test should be applied going forward.

Sorrell is distinguishable from the present case in several respects. First, the Vermont statute banned the sale of prescriber-identifying information "based in large part on the content of a purchaser's speech." Id. at __, 131 S. Ct. at 2663, 180 L. Ed. 2d at 554. For example, the information could be purchased by those who wished to participate in educational communications, but could not be purchased for purposes of marketing or advertising. Ibid. The Court noted that the

statute specifically "disfavor[ed] marketing, that is, speech of a particular content."  Ibid.  Further, in concluding that heightened scrutiny was required, the Court criticized the fact that the statute "disfavor[ed] specific speakers, namely pharmaceutical manufacturers."  Ibid.

Here, by contrast, N.J.S.A. 34:8B-1 does not favor one type of speaker over another, as all employers that choose to advertise for open job positions through print or Internet postings are equally subject to the terms of the statute.  In addition, the statute regulates a type of speech — advertising — that the United States Supreme Court traditionally has held to be "commercial speech" less worthy of constitutional protection than political speech.

In electing to apply the Central Hudson test to this appeal, we also find it significant that the United States Supreme Court has yet to issue an opinion applying the "heightened scrutiny" test intimated by Sorrell to a restriction on commercial speech.  Moreover, the Court has not clearly elucidated what that "heightened scrutiny" might entail.  In the wake of the Supreme Court's post-Sorrell silence and inaction,

many federal and state courts are continuing to apply the standard set forth in Central Hudson.[17]

D.

Applying, as a whole, each of the four Central Hudson factors to the present statute, we conclude that appellants have failed to meet their burden of demonstrating that the law

---

[17] For example, a United States District Court noted that:

> Certainly, the Sorrell decision reaffirms the core meaning of the First Amendment . . . . However, the Supreme Court stopped far short of overhauling nearly three decades of precedent, which is clearly demonstrated by the fact that the opinion characterizes commercial speech precedence, including Central Hudson, itself, for support. This alone is enough to find that the typical commercial speech inquiry under intermediate scrutiny remains valid law. If the Court wished to disrupt the long-established commercial speech doctrine as applying intermediate scrutiny, it would have expressly done so. Absent express affirmation, this Court will refrain from taking such a leap.
>
> [King v. Gen. Info. Servs., Inc., 903 F. Supp. 2d 303, 308 (E.D. Pa. 2012) (internal citations omitted).]

Other jurisdictions have taken a similar approach. See Educ. Media Co. at Va. Tech., Inc. v. Insley, 731 F.3d 291, 298 (4th Cir. 2013); Valle Del Sol, Inc. v. Whiting, 709 F.3d 808, 821 (9th Cir. 2013); United States v. Caronia, 703 F.3d 149, 162-69 (2d Cir. 2012); R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1226 n.4 (D.C. Cir. 2012); Demarest v. City of Leavenworth, 876 F. Supp. 2d 1186, 1194-95 (E.D. Wash. 2012).

violates the First Amendment. We analyze the four factors as follows.

## 1.

The first prong of the Central Hudson test requires little discussion. The Department acknowledges that N.J.S.A. 34:8B-1 "regulates a job advertisement posted by Crest that is about a lawful activity and is not inherently misleading." We accept that sensible concession, although it does not end the four-part analysis.

## 2.

The second prong of the test considers whether the governmental interest underlying the statute is "substantial."[18]

_____

[18] Appellants allude to a void-for-vagueness argument within their analysis of the second prong of the Central Hudson test. However, as the Department points out in its own brief, this argument hinges incorrectly on statements made by Governor Christie in his conditional veto message, where he stated that "the bill, as currently drafted, is too vague and confusing." Governor's Conditional Veto to Assembly Bill No. 3359, supra, at 1 (emphasis added). All of the changes that the Governor proposed to alleviate the alleged vagueness of the draft bill were incorporated into its final approved version.

Further, a plain reading of N.J.S.A. 34:8B-1 convinces us that the law does not violate the standards of the vagueness doctrine. See Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 238 (1980) ("[I]n determining whether local legislation is impermissibly vague, [courts] are not confined to its literal terms. The meaning of . . . a general standard may be implied from 'the entire act in the light of its surroundings and objectives.'") (quoting Ward v. Scott, 11 N.J. 117, 123 (1952)); State v. Stafford, 365 N.J. Super. 6, 15 (App. Div. 2003) ("The vagueness doctrine is premised on the notion that the law must

(continued)

To be sure, "[t]he burden is on the State to establish the existence of the substantial governmental interest it sought to advance" through the enactment of this statute. <u>Hamilton Amusement Ctr.</u>, <u>supra</u>, 156 <u>N.J.</u> at 269. However, "[b]oth the United States Supreme Court and this Court have held that the government does not have a heavy burden to satisfy the substantial governmental interest prong of the <u>Central Hudson</u> standard. That burden may be satisfied in a variety of different ways." <u>Id.</u> at 270-71.

For example, in <u>Burson v. Freeman</u>, 504 <u>U.S.</u> 191, 211, 112 <u>S. Ct.</u> 1846, 1858, 119 <u>L. Ed.</u> 2d 5, 22 (1992), the United States Supreme Court upheld a Tennessee statute prohibiting the solicitation of votes and the display and distribution of campaign materials within 100 feet of a polling place, finding that the government had a substantial interest in keeping the election process "free from the taint of intimidation and fraud." The Court reached this conclusion based not on empirical evidence, but on "[a] long history, a substantial consensus, and simple common sense." <u>Ibid.</u>

_____

(continued)
'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'") (quoting <u>Grayned v. City of Rockford</u>, 408 <u>U.S.</u> 104, 108, 92 <u>S. Ct.</u> 2294, 2298, 33 <u>L. Ed.</u> 2d 222, 227 (1972)).

A-0417-12T4

Appellants are correct that the texts of N.J.S.A. 34:8B-1 and -2 and the sponsor's official statement do not explicitly articulate the "substantial government interest" that the Legislature sought to address, and the State has not provided empirical support of the efficacy of the statute. Nonetheless, we are persuaded that the legislative objective associated with the statute is a "substantial" one. We reach that conclusion based upon a fair conception of the deliberately circumscribed nature of the law's scope.

It is evident that the statutes before us have a modest aim: to maximize the ability of jobless persons to simply present their qualifications to potential employers. The statutes do not pretend to do more than that. They do not, for instance, require employers to read such applications, or to bring in any jobless persons for interviews, or to hire any of those persons in lieu of applicants who already have other jobs.

Moreover, if the statutes had gone to such extra lengths, they would probably be evaluated under the fairly lenient constitutional standards for economic regulation under the Due Process and Equal Protection Clauses.[19] It would be ironic

---

[19] See, e.g., Nordlinger v. Hahn, 505 U.S. 1, 10-17, 112 S. Ct. 2326, 2331-35, 120 L. Ed. 2d 1, 13-17 (1992) (applying the "minimum rationality" test of the Equal Protection Clause for governmental classifications in economic regulation); Williamson
(continued)

indeed if the less ambitious statute adopted by the Legislature would be more constitutionally vulnerable than a more aggressive measure.

N.J.S.A. 34:8B-1 and -2 have a less ambitious scope than a sweeping general anti-discrimination law protecting the jobless. But that limited scope does not make the governmental interests insubstantial. Indeed, the substantiality prong of Central Hudson has frequently been construed and applied to accord considerable deference to the policy choices of elected officials.[20] We are not a "super-Legislature" empowered to strike down laws based upon our own policy preferences or our

(continued)
v. Lee Optical of Okla., Inc., 348 U.S. 483, 487-88, 75 S. Ct. 461, 464-65, 99 L. Ed. 563, 572 (1955) (similarly applying, under the Due Process Clause, a rational basis analysis).

[20] See, e.g., Thompson v. W. States Med. Ctr., 535 U.S. 357, 369, 122 S. Ct. 1497, 1505, 152 L. Ed. 2d 563, 575 (2002) (finding that the government had a substantial interest in protecting the effectiveness and integrity of its new drug approval process and preserving availability of compounded drugs for patients); Edenfield v. Fane, 507 U.S. 761, 768-70, 113 S. Ct. 1792, 1798-1800, 123 L. Ed. 2d 543, 553-55 (1993) (finding that a regulation of solicitation by certified public accountants was justified by the government's substantial interest in ensuring accuracy of statements, protecting public from fraud, ensuring client privacy, and maintaining ethical standards); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507, 101 S. Ct. 2882, 2892, 69 L. Ed. 2d 800, 815 (1981) (finding that a regulation of billboards furthered the government's interest in traffic safety and aesthetics).

collective personal senses of what we deem important and substantial.

The inescapably clear premise of these challenged laws is that, although employers may discard or ignore many resumes and applications that they receive from jobless applicants, undoubtedly some currently unemployed applicants will stand out. At least some of them, from time to time, will possess such impressive or well-suited credentials that they will receive a job offer despite an employer's initial reluctance to consider unemployed applicants. Indeed, the recent severe recession and the all-too-frequent closure, downsizing or migration of businesses from our State have unfortunately caused innumerable very talented workers with vast amounts of skill to find themselves out of work. A portion of those now unemployed persons might well be of interest to companies with vacancies, if they were not discouraged from sending in their applications by the prohibitive words of job advertisements.[21]

The Legislature and the Governor reasonably determined that job-seekers should not be repelled by ads proclaiming that the unemployed "need not apply." It is not our province to

---

[21] We realize that the parties have stipulated that some unemployed persons applied to Crest despite the restrictive wording of its ad. But that circumstance does not mean that other unemployed would-be applicants were not discouraged.

trivialize that objective by declaring that the law does not go far enough to be worthwhile.

The second prong of substantiality is therefore met.

3.

For related reasons, we are also satisfied that the third prong of Central Hudson is fulfilled, as the statute "directly advances the governmental interest asserted." Central Hudson, supra, 447 U.S. at 566, 100 S. Ct. at 2351, 65 L. Ed. 2d at 351.

We agree with the Department's assertion in its brief that "[t]he statute, in ensuring that a help wanted ad cannot exclude unemployed job seekers, directly serves the purpose of increasing the opportunities for unemployed workers to apply for work." (Emphasis added). Although the Department has not presented an empirical study to confirm this assertion, for the reasons that we have already mentioned, there is a logical nexus between the terms of the statute and its desired goals. Again, if the "governmental interest" at stake were more ambitiously defined as, for example, a material increase in the hiring of unemployed persons, the Department's ability to satisfy the third prong on the facts presented would be questionable. But, as we have noted, if the scope of the statute is conceived more modestly as a measure to simply get more resumes into the hands

of prospective employers, then the law is surely crafted to advance that goal.

4.

The fourth and final prong of the <u>Central Hudson</u> test requires a determination as to whether <u>N.J.S.A.</u> 34:8B-1 "is narrowly tailored to serve the State's asserted interests." <u>Hamilton Amusement Ctr.</u>, <u>supra</u>, 156 <u>N.J.</u> at 276; <u>see also</u> <u>Central Hudson</u>, <u>supra</u>, 447 <u>U.S.</u> at 566, 100 <u>S. Ct.</u> at 2351, 65 <u>L. Ed.</u> 2d at 351. "[T]he regulation need not be the least restrictive means of serving the State's . . . substantial interest." <u>Hamilton Amusement Ctr.</u>, <u>supra</u>, 156 <u>N.J.</u> at 277 (citations omitted). Rather, the narrow tailoring requirement is satisfied "'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" <u>Ibid.</u> (quoting <u>Ward v. Rock Against Racism</u>, 491 <u>U.S.</u> 781, 797, 799, 109 <u>S. Ct.</u> 2746, 2757, 2758, 105 <u>L. Ed.</u> 2d 661, 679, 680-81 (1989)).

We conclude that this final element of the test also weighs in favor of the Department. We agree with the Department's argument that the means employed by this statute "are quite narrowly tailored" because employers are simply obligated to "refrain from excluding unemployed workers in job advertising,"

31

A-0417-12T4

but may still "advertise job openings in the manner they desire, and ultimately they can select who they want for the job."

As we have indicated, the manifest purpose of the statute is to ensure that unemployed residents of the State are not categorically deterred from applying for job opportunities merely because they are currently out of work. The statute reaches no further than what is required to achieve its stated purpose and, in fact, explicitly allows employers to restrict potential candidates based on other criteria.

For example, in keeping with the Governor's conditional veto amendments, an employer is permitted under the statute to state in an advertisement for a job vacancy that the minimum qualifications for that particular position include a certain professional license or certificate, a certain degree or educational background, or a certain number of years of training or experience in the field. See N.J.S.A. 34:8B-1. In addition, employers are not prohibited from stating in an advertisement, if they so choose, that they will only accept applications from persons currently employed by them in another position than that being advertised. Ibid.

Because the statute only prohibits an employer from stating in its ads that current employment is a prerequisite to the acceptance of an applicant's materials, we concur with the

Department's contention that N.J.S.A. 34:8B-1 is no more extensive than necessary to serve the government's asserted interest.

### III.

We need not say much about appellants' passing contentions of unconstitutionality that are not grounded upon free speech principles. In particular, we reject appellants' claim that N.J.S.A. 34:8B-1 and -2 violate Article I, Paragraph 1 of the New Jersey Constitution, which provides, in pertinent part, that "[a]ll persons . . . have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1.

Appellants contend in this regard that a business owner's fundamental rights are being "abridged" by this law because the "implicit object[ive] of this statute" is to "force an employer to hire the unemployed." We disagree with that characterization. As the Department explains in its brief, the statute is "intended to enable unemployed workers to apply for jobs, and is not aimed at requiring employers to actually hire unemployed applicants. The law thus takes a very measured

approach to the objective it seeks to achieve." (Emphasis added).

"Insofar as most rights are concerned, a state statute does not violate [principles of] substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." Greenberg v. Kimmelman, 99 N.J. 552, 563 (1985) (citing Nebbia v. New York, 291 U.S. 502, 537, 54 S. Ct. 505, 516, 78 L. Ed. 940, 957 (1934)). "Briefly stated, if a statute is supported by a conceivable rational basis, it will withstand a substantive due process attack." Ibid. (citing Williamson, supra, 348 U.S. at 488, 75 S. Ct. at 464, 99 L. Ed. at 572).

There is clearly such a rational basis underlying the legislation before us. Appellants' claims to the contrary lack merit, as do the rest of their various subsidiary claims of invalidity. We need not comment on them further. R. 2:11-3(e)(1)(E).[22]

IV.

Having concluded in this case of first impression that N.J.S.A. 34:8B-1 and -2 are indeed constitutional, we therefore

_____

[22] Because appellants have not prevailed on their constitutional challenge, we need not reach their belated claim for counsel fees, a claim which was not asserted before the agency, in their notice of appeal, or in their appellate case information statement.

sustain the Department's finding that appellants' job advertisement violated the statutes. Even so, we are not prepared at present to sustain the $1,000 penalty imposed upon them by the Department.

The language of N.J.S.A. 34:8B-2 does not require imposition of the authorized full penalty in all instances of a proven violation. Instead, the statute authorizes a penalty that is "not to exceed $1,000 for the first violation." N.J.S.A. 34:8B-2 (emphasis added).

Moreover, the implementing penalty regulation, N.J.A.C. 12:67-1.4, states as follows:

> When the Director finds that an employer or employer's agent, representative, or designee has violated the Act, the Director is authorized to assess an administrative penalty against the employer in the amounts that follow:
>
> 1. First violation — not more than $1,000[.]
>
> [N.J.A.C. 12:67-1.4(a).]

In addition, the regulation states that:

> In determining what constitutes an appropriate administrative penalty for a particular violation, the following factors shall be considered, where applicable:
>
> 1. The seriousness of the violation;
>
> 2. The past history of previous violations by the employer;
>
> 3. The good faith of the employer;

4. The size of the employer; and

5. Any other factors which are deemed appropriate under the circumstances.

[N.J.A.C. 12:67-1.4(c).]

This language indicates that the imposition of penalties for violations of N.J.S.A. 34:8B-1 involves an exercise of discretion.

The Commissioner did not refer to these discretion-guiding factors[23] in his decision imposing the maximum $1,000 penalty. Nor did the Commissioner have the chance to consider the equities of the penalty in light of the nature of the substantial constitutional issues litigated in this appellate forum. Although appellants' constitutional arguments ultimately were not successful, we do observe that they were non-frivolous in nature, and that, by all indications in this record, they were presented in a good faith effort to test the validity of this relatively new statute. These distinctive factors are potentially relevant in determining whether the fine should be reconsidered.

---

[23] We do not fault the Commissioner in this regard because appellants chose to focus their argument at that time on the substantive issues of constitutionality rather than the calibration of the penalty.

In light of the unique posture of this precedential case, we therefore choose to remand the penalty aspect of this matter for further consideration by the Commissioner, and for the express application of the discretionary factors set forth in the regulation.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION